In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-2791

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TONY L. WARREN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03-CR-113-2—**Elaine E. Bucklo**, *Judge.*

ARGUED APRIL 14, 2006—DECIDED JULY 27, 2006

Before BAUER, ROVNER, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Tony Warren was convicted of various charges related to a fraudulent check scheme. What makes Warren's convictions unusual is his insistence that the fraud was authorized by the United States Secret Service. Warren stipulated that he sent several altered checks purportedly made out to "A&B Electrical" to an individual named Robert Studnicka, who cashed them and kept a portion of the proceeds for himself. Police caught Studnicka, who cooperated and implicated Warren in the scheme. The two were charged in a nine-count superseding indictment with violating 18 U.S.C. §§ 1344 (prohibiting bank fraud), 2314 (forbidding transporting forged and fraudulent checks in interstate commerce), and 513 (prohib-

iting making, uttering, or possessing forged securities). Studnicka pleaded guilty, but Warren went to trial, claiming that his behavior was authorized because he was a confidential informant for the United States Secret Service. The jury disbelieved Warren's defense, and convicted him on all counts. Warren now appeals, raising a number of alleged errors at both trial and sentencing.

## I.

Although the details remain murky, the premise of the check scheme is fairly straightforward. Legitimate checks issued by corporations such as Whirlpool and National Geographic, among others, were altered so that the payee on each check was A&B Electric, a company owned by Studnicka. Warren, who was living in New York at the time, then sent the altered checks to Studnicka, who was living in Illinois (Warren has never disclosed how he obtained the checks). Studnicka then deposited the checks, which ranged in amount from $65,000 to $280,000, into his bank accounts at Palos Heights Bank and Trust and First Midwest Bank. Generally Studnicka would withdraw proceeds from the checks to send to Warren (between $20,000 to $30,000) and keep the remainder for himself. Warren and Studnicka repeated this pattern approximately five times between December 2002 and January 2003. That same month, Studnicka was arrested, owing in part to suspicion raised by the failure of a $214,000 check he deposited at Palos Heights Bank and Trust to clear.

After Studnicka's arrest, he agreed to cooperate in the investigation against Warren. Under the direction of federal agents, Studnicka persuaded Warren to come to Illinois to pick up his remaining share of the checks that Studnicka had cashed. Warren agreed to meet Studnicka at a mall in Matteson, Illinois, ostensibly to recover approximately $200,000 that he believed Studnicka still owed him.

Studnicka met Warren in the parking lot, and agents arrested both men. The government indicted them in April 2003, and returned a superseding indictment in August 2003.

Warren admitted giving the checks to Studnicka, but he provided an unusual justification: he claimed he was working as a confidential informant for the Secret Service in New York. The government initially denied that Warren had ever worked as a confidential informant. Then in August 2003, the government acknowledged that Warren had worked as a confidential informant for a brief period between March and April 2001. The government submitted two affidavits from Douglas Farrell, a Chicago-based Secret Service agent who had investigated the pending charges against Warren. The first affidavit explained that when they first explored Warren's claim that he was a confidential informant, the New York Secret Service offices were unable to confirm the claim. After contacting the Secret Service Investigative Support Division, however, Chicago Secret Service agents learned that Warren had in fact worked briefly as a confidential informant, but that he had been "formally deactivated" in April 2001. Farrell's second affidavit, tendered in response to a court order for the government to provide Warren with "all information relating to defendant's status as a confidential informant," explained that the paperwork associated with Warren's service as a confidential informant had been destroyed by the September 11, 2001 terrorist attacks on the World Trade Center. Nearly a year later, in July 2004, the government tendered a draft Secret Service report detailing Warren's work as a confidential informant. Secret Service agent Brian Koch gave the report to prosecutors during an interview, and they tendered it promptly to Warren.

In addition to Agent Farrell's affidavits and Agent Koch's report, at Warren's request the government facilitated a

telephone interview between Warren's counsel and Secret Service agent Matthew Quinn, who had worked with Warren. Quinn provided background information about how Warren became involved with the Secret Service. Quinn explained that in February 2001 he worked on the "West African Task Force," investigating crimes committed primarily by Nigerian nationals in the United States and overseas. Warren had come to the attention of the Secret Service in 1999 when agents obtained a counterfeit check made out to Warren and drawn on the Central Bank of Nigeria. Nothing came of this initial contact, but Warren later approached the Secret Service in early 2001, at which point he had lost approximately $400,000 in a scam known as an "advance fee fraud." In one iteration of this scheme, someone from Nigeria contacts a United States citizen (often a small business owner who can readily access capital) with a lucrative but somewhat shady "business" venture. The story would be, for instance, that due to a government contract overrun, between $20 and $40 million of "free" money was tied up in Nigeria. With a cash bribe for some Nigerian government official, however, the money could be released. The individual contacted would be asked to advance, for example, $10,000 or $15,000 for the bribe, and would be promised anywhere from 10 to 50 percent of the multi-million dollar sum in exchange. This fantastic-sounding "opportunity" was accompanied by official-looking documentation. The scheme did not stop after the first $10,000 to $15,000. Instead, the perpetrator encountered a series of supposed snags in accessing the money, each of which required the victim to continue sending funds in hopes of getting the big payoff or at least recouping his original "investment."

As a victim of this scheme, Warren was enlisted by the Secret Service to help infiltrate the Nigerian fraud ring and bring one of its leaders to the United States for arrest. According to agents who worked with Warren, his time as a

confidential informant was short-lived due to his frustration with the pace of the investigation and ultimately his refusal in March 2001 to turn over a counterfeit $3 million check. In connection with this incident and a later independent federal investigation into fraudulent checks, Warren was arrested in June 2002 by federal officials in New York. However, the complaint against him was later dismissed.

Before his trial on the current charges, Warren stipulated that he had caused the checks to be sent to Studnicka. His trial thus centered on his public authority defense. Studnicka testified against Warren, and the government played taped conversations between Studnicka and Warren made after Studnicka's arrest. In the tapes, Warren refers repeatedly to the "Nigerians," and his need to go to the "motherland" to get his money back.

Two Secret Service agents who had worked with Warren also testified. The first, Matthew Quinn, explained that he and two other agents, Kevin Worthington and Brian Koch, met with Warren in late 2000 or early 2001. After seeing the documents Warren had received from the perpetrators, the agents enlisted Warren as a confidential informant. Shortly thereafter, at the beginning of March 2001, Quinn was transferred from the West African Task Force to the presidential detail. Despite the transfer, Quinn continued to work informally with Worthington and Koch when the need arose. Quinn testified that one of his last conversations with Warren was to tell him that he was no longer to do anything on behalf of the Secret Service.

In connection with that testimony, Warren's counsel asked Quinn what "deactivation" meant, to which Quinn responded, "'deactivation' is not really a word that I would use." Believing that Quinn had used the term in his pre-trial telephone interview, counsel sought to impeach Quinn using the telephone interview, but the court sustained the government's objection.

Agent Brian Koch, who had taken over supervising Warren when Quinn was transferred, also testified. He recounted that in April 2001 Warren had received a check for $3 million from a Nigerian man named Dr. Oduebo. Warren faxed Koch a copy of the check, and Koch informed him that it was counterfeit. He testified that he told Warren to hold on to the check until agents could come retrieve it. But when Koch arrived to pick up the check, Warren told Koch that he was too late; the check was gone. Warren then left under the pretense of retrieving the check. After waiting an hour or so for Warren to return, Koch left and returned to his office. He later spoke to Warren on the phone and informed him that he was no longer working as an informant, and that if he tried to cash the check he would be prosecuted.

Warren testified in his own defense. He insisted that Secret Service agents had never told him that he was no longer to act as a confidential informant. Instead, he maintained that he was authorized to do "whatever it takes" to infiltrate the "Nigerian mob." He claimed that he was still acting pursuant to that mandate in late 2002 and early 2003 when he gave the fraudulent checks to Studnicka to cash, and that as he sat testifying he remained in "deep cover" pursuant to that mission. Warren also testified about the earlier charges against him in New York. He used the fact that those charges had been dropped to advance his theory that he was still working as a confidential informant at the time of his interaction with Studnicka nearly two years after he began working as a confidential informant.

After Warren rested his case, the government called Assistant United States Attorney Richard Donoghue, who had overseen the 2002 charges against Warren in New York. According to Donoghue, Warren was never indicted for several reasons. The decision to dismiss the original criminal complaint was fueled by time constraints and the fact that additional fraudulent checks were uncov-

ered during the investigation of the initial charges. Donoghue also testified that at least one check had been destroyed in the World Trade Center on September 11. Finally, Donoghue explained that when his office learned about the indictment in Chicago, it decided to wait until that prosecution concluded instead of conducting two parallel prosecutions.

Donoghue also testified that Warren had called him after the New York charges were filed, "rambling" about it being "the season for checks" and claiming that he wanted to "get the Nigerians." When Donoghue reminded Warren that his last attempt at cooperation had not been entirely successful, Warren claimed that the Secret Service had "bullshitted" him. Donoghue also rebuffed Warren's attempt to set up a private meeting with him. Donoghue had contemporaneous notes from that conversation, which he provided to prosecutors the night before testifying. Prosecutors, in turn, provided the notes to Warren the morning of Donoghue's testimony. After Donoghue's testimony, Warren's counsel asked the court if Warren could take the stand again to refute portions of Donoghue's testimony. The district court reluctantly agreed, but then Warren decided against testifying further and both sides rested.

The jury apparently disbelieved Warren's public authority defense, and convicted him on all counts (except Count 5, which was dismissed). Warren moved for a new trial, alleging that a number of trial errors deprived him of a fair trial and that the government had withheld exculpatory evidence relating to his status as a confidential informant. The court denied his motion. At sentencing, the district court declined to award Warren credit under the advisory guideline range for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, and also adjusted the advisory range upward based on her finding that Warren obstructed justice by lying when he testified at trial that he was still acting as a confidential informant, *see* U.S.S.G. § 3C1.1. These calculations, com-

bined with Warren's lack of any criminal history, resulted
in an advisory guideline range of 41 to 51 months. The court
sentenced Warren to 41 months imprisonment followed
by five years of supervised release, and ordered him to
pay full restitution of $177,905.49 (jointly and severally
with Studnicka).

## II.

Warren claims that his right to a fair trial was prejudiced
because the government withheld information relating to
his status as a confidential informant and belatedly dis-
closed Donoghue's notes. He also argues that he was
prejudiced by his inability to impeach Agent Quinn with the
notes from his telephone interview. Finally, he attacks his
sentence and the jury instructions at his trial. We consider
his arguments in turn.

### A.  Motion for a New Trial

#### 1.  *Brady* Violations

First, Warren argues that the district court erred by
denying his motion for a new trial, premised on alleged
discovery and trial errors. He contends that the government
breached its discovery obligations by withholding informa-
tion about his status as a confidential informant. He points
in particular to the government's failure to produce inde-
pendent written evidence of his "deactivation" as a confiden-
tial informant—evidence he insists exists based on Agent
Farrell's affidavit to the effect that Warren was "formally
deactivated" in April 2001.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme
Court held that "the suppression by the prosecution of
evidence favorable to an accused . . . violates due process
where the evidence is material either to guilt or to pun-

ishment, irrespective of the good faith or bad faith of the prosecution," *id.* at 87. In order to demonstrate a *Brady* violation, Warren must make three showings: (1) that the evidence is favorable to him because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either wilfully or inadvertently; and (3) that "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States v. Price*, 418 F.3d 771, 785 (7th Cir. 2005). To demonstrate prejudice, Warren must establish a reasonable probability that the result of the trial would have been different if the evidence had been disclosed. *Strickler*, 527 U.S. at 280; *see also United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006). We review the district court's denial of a motion for a new trial premised on alleged *Brady* violations for abuse of discretion, *see United States v. Elem*, 269 F.3d 877, 881 (7th Cir. 2001), viewing the evidence in the light most favorable to the prevailing party*, Childs*, 447 F.3d at 544.

The central thesis of Warren's *Brady* claim is that the government has not been forthcoming with documentation of his service as a confidential informant and has never produced a written document informing Warren that he is no longer a confidential informant. In denying Warren's motion for a new trial, the district court pointed out that Warren had failed to establish that such a document exists. Warren now faults the district court for focusing too much on a "deactivation" form and overlooking Warren's argument that the government withheld other information as well. Warren, however, fails to identify any such "other information" with precision. Instead, he takes aim at the government's responses to discovery in general, pointing to its initial denial of his claim that he was a confidential informant, its failure to mention the September 11 terrorist attacks as a reason it lacked information until Farrell's second affidavit, and the late production of Brian Koch's draft Secret Service report. Warren argues that the govern-

ment's shifting position on the evidence it did disclose necessarily means other evidence must have been withheld. He also continues to insist that Agent Farrell's use of the phrase "formally deactivated" means there must be some official document stating that Warren no longer works as a confidential informant.

Whether limited to an alleged document deactivating Warren as a confidential informant or expanded to include the universe of all documentation of Warren's confidential informant activities, the result is the same. As the district court recognized, Warren is simply unable to point to any specific evidence, exculpatory or otherwise, withheld by the government. Without that, his *Brady* claim fails to get off the ground. *See Price*, 418 F.3d at 785 (no *Brady* violation where no document existed corroborating defendant's claim of alleged agreement between government and prosecution witness). Even assuming the existence of such evidence, it is far from clear that it would be exculpatory or impeaching. Take for instance Warren's insistence that there must be some document "deactivating" him as a confidential informant. Far from exonerating Warren, such a document would undercut his public authority defense and deprive him of one of his theories of defense: that he never received any official notice informing him that he was no longer a confidential informant, and he thus continued to believe at the time he committed the offenses that he was infiltrating the Nigerian fraud ring on behalf of the Secret Service.

Without any evidence that the government withheld information, Warren's claim is reduced to a complaint about the timing of various government revelations. Warren, however, fails to explain what he would have done differently if the government had admitted earlier that he was a confidential informant or provided information, such as Agent Koch's report, sooner. Late disclosure does not itself

constitute a *Brady* violation. *See United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). Warren used all of the information the government did provide and built a defense around his claim that he was a confidential informant. *Id.* at 569 (no *Brady* violation where government disclosed information during trial but defendant had sufficient time to make use of it); *see also United States v. Knight*, 342 F.3d 697, 708-09 (7th Cir. 2003) (no *Brady* violation where defendant made effective use of evidence despite government's late disclosure). The district court thus did not abuse its discretion by denying his motion for a new trial premised on documentation related to his status as a confidential informant.

### 2.   Donoghue's Notes

Likewise, the district court was within its discretion to conclude that Warren was not entitled to a new trial based on the government's handling of Assistant United States Attorney Richard Donoghue's notes from his 2002 conversation with Warren. As discussed above, the government called Donoghue to refute the inference created by Warren's testimony that the New York charges against him were dismissed because he was a confidential informant. Shortly before Donoghue took the stand, the government produced the notes he had made memorializing Warren's odd November 2002 call requesting a private meeting. Warren argues that by failing to produce the notes earlier, the government violated *Brady* and Federal Rule of Criminal Procedure 16.

Rule 16 requires the government, at the defendant's request, to disclose "the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Fed. R. Civ. P. 16(a)(1)(A). The trial court has discretion to fashion a remedy for the government's noncompliance with Rule 16, *United States v. De La*

*Rosa*, 196 F.3d 712, 715 (7th Cir. 1999), and this court will not disturb the district court's decision absent a showing of abuse of discretion and prejudice, *United States v. Breland*, 356 F.3d 787, 797 (7th Cir. 2004). Although Warren requested a new trial, such a remedy is warranted only when "all other, less drastic remedies are inadequate." *De La Rosa*, 196 F.3d at 715. Additionally, a new trial is appropriate only if the alleged Rule 16 violation deprived Warren of a fair trial. *See United States v. Miller*, 199 F.3d 416, 420 (7th Cir. 1999).

Warren's inability to establish prejudice dooms his claim. Assuming Donoghue's notes were in fact protected by Rule 16 (made as they were in response to Warren's call to Donoghue, the applicability of the Rule is far from clear), Warren was prejudiced by their belated production only if he was "unduly surprised" and lacked "an adequate opportunity to prepare a defense." *Breland*, 356 F.3d at 797. The government produced the notes before Donoghue testified, and Warren does not argue on appeal that he would have mounted a different defense had he obtained the notes sooner. Instead, he asserts generally that Donoghue's handwritten notes "related to the central issue of defendant's status as a CI and his defense of public authority." But this point is irrelevant unless the timing of the notes' production somehow prevented Warren from using them in his defense. Indeed, he did not request a continuance when the notes were disclosed, Fed. R. Crim. P. 16(d)(2)(B) (authorizing court to grant continuance for non-compliance with Rule 16), and at a sidebar after Donoghue's testimony counsel decided against having Warren take the stand again. Because Warren's counsel made use of the notes in his cross-examination, and Warren does not explain what he would have done differently had he obtained them earlier, the district court did not abuse its discretion by denying his motion for a new trial premised on the notes. *Breland*, 356 F.3d at 797; *De La Rosa*, 196 F.3d

at 716-17 (no prejudice where defendant rejected court's offer of continuance and no bad faith was shown on government's part); *see also Knight*, 342 F.3d at 705-06 (no *Brady* violation when government disclosed impeachment evidence in time for defendants to incorporate information into cross-examination).

### 3.  Impeachment of Agent Quinn

Warren next argues that the he was denied a fair trial because the district court refused to allow him to cross-examine Agent Quinn with what Warren characterizes as Quinn's prior inconsistent statement. While cross-examining Quinn, Warren's counsel asked him what the term "deactivation" meant, to which Quinn responded, "'deactivation' is not really a word that I would use, but it's—I'm assuming you are asking if it is applying towards taking a CI who is activated and deactivating him." Counsel then attempted to seize on Quinn's representation that "deactivation" was not really a term he would use and suggest that he had in fact used the term in his pre-trial telephone interview. During that interview, the government asked Agent Quinn if he recalled "when Tony [Warren] was deactivated as a CI" and "why it was he was deactivated." Defense counsel then asked Quinn what he meant by "deactivation," to which Quinn responded, "[d]eactivation just simply means the—no longer using an individual as an informant." In response to continuing questions from counsel, Quinn used the term "deactivation" several other times during the interview.

This exchange forms the basis for Warren's claim that he was denied an opportunity to impeach Quinn with his prior inconsistent statement. Believing the telephone interview could not be used because it was unsworn, the district court denied Warren's attempt to refer to it at trial. When Warren later moved for a new trial, he represented to the

court that he had been denied the opportunity to impeach Quinn's testimony on the issue of whether Quinn "told Warren he was deactivated." At that point, the district court acknowledged that it may have erroneously excluded the prior statement on the grounds that it was unsworn, and so ordered further briefing on whether its refusal to allow the "impeachment" was harmless. After reviewing Quinn's testimony against the actual transcript of the telephone interview, however, the district court concluded that there was no inconsistency, and thus no error in its decision to prohibit the "impeachment." We review the district court's decision for abuse of discretion. *See United States v. Heath*, 447 F.3d 535, 538 (7th Cir. 2006).

We agree with the district court that any error in disallowing the statement was harmless because Quinn's trial testimony is not inconsistent with his telephone interview. In the telephone interview, Quinn was repeatedly asked if he told Warren that he was "deactivated." Agent Quinn responded, that no, he did not tell Warren that he was "deactivated," but he did tell Warren that he was no longer authorized to do anything on behalf of the Secret Service. Then at trial Agent Quinn testified that "deactivation" is not a term that he uses. The fact that Agent Quinn repeated the word "deactivation" during the telephone interview does not undercut his trial testimony that he does not use the word "deactivation" to tell someone that he is no longer a confidential informant.

In his brief Warren makes much of what he characterizes as the district court's admission of error regarding the statement's admissibility. But his argument ignores the district court's ultimate finding that any error was harmless—a finding that is not clearly erroneous in light of the fact that Quinn's statements in the telephone interview were not actually inconsistent with his trial testimony. *See United States v. Douglas*, 408 F.3d 922, 927 (7th Cir. 2005)

(rejecting defendant's argument that district court erroneously limited cross-examination because the "so-called impeachment evidence was not relevant"); *United States v. Akinrinade*, 61 F.3d 1279, 1287 (7th Cir. 1995) (upholding district court's refusal to issue jury instruction regarding prior inconsistent statements when "[t]here simply were no clear inconsistencies in testimony").

## B. Sentencing

Warren next takes issue with two of the district court's decisions at sentencing. First, he contends that the district court erroneously imposed an upward adjustment to his sentence for obstruction of justice. Relatedly, he takes issue with the district court's failure to give him credit for acceptance of responsibility.

Under § 3C1.1 the district court may enhance a defendant's sentence two levels after finding that he willfully obstructed or impeded justice during the offense of conviction. *See* U.S.S.G. § 3C1.1. The comments to that guideline list "committing, suborning, or attempting to suborn perjury" as behavior warranting the enhancement. However, as Warren points out, neither denying guilt nor testifying and later being found guilty themselves provide a basis for the enhancement. U.S.S.G. § 3C1.1, comment, n.2. Thus, if a defendant objects "to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993); *see also United States v. Williams*, 272 F.3d 845, 864 (7th Cir. 2001). We review the district court's application of the Guidelines de novo and its factual determinations for clear error. *See United States v. Davis*, 442 F.3d 1003, 1008-09 (7th Cir. 2006).

Warren did challenge the obstruction-of-justice adjustment, and the district court made appropriate factual

findings to support it. On appeal, Warren renews his argument that the jury's guilty finding alone does not lead to the conclusion that he lied under oath. He could, for example, honestly have believed that he was acting as a confidential informant, and the jury could still have found him guilty on the grounds that his belief was unreasonable. The district court recognized this and made its own findings as follows: "[W]hat we have here is that I need to make a finding, and unfortunately I do find that he made material misstatements under oath on the stand." The court went on to point out that it was authorized to decide that Warren had obstructed justice, and found specifically that, "when he said that these agents all said that his conduct would be legal, that he knew that that was not true . . . when he asserted that Agent Brian Koch was not truthful when he claimed he deactivated the defendant, that the defendant knew that was not true . . . when he said that no one ever told him to stop working for the Secret Service, that he knew that that was not true . . . when he said that the Secret Service authorized his activity with respect to the checks charged in the indictment, he knew that was not true; and when he said that he was still in deep cover, he knew that that was not true."

Unsatisfied with these findings, Warren argues that in the wake of *United States v. Booker*, 543 U.S. 220 (2005), the jury must make the factual findings necessary to support an obstruction-of-justice enhancement. His argument is meritless. As we recently recognized in another obstruction-of-justice case, the Supreme Court in *Booker* "held that a Sixth Amendment problem arises where the sentence exceeds the statutory maximum for the charged crime or is imposed under a mandatory sentencing scheme, not that district courts may not conduct judicial fact-finding." *United States v. White*, 443 F.3d 582, 592 (7th Cir. 2006). *White* continues, "[t]o the contrary, 'Booker resolved the problem by making the guidelines

advisory; judicial fact-finding in sentencing is acceptable because the guidelines are now nonbinding.'" *Id.* (quoting *United States v. Robinson*, 435 F.3d 699, 701-02 (7th Cir. 2006)). Thus, the district court was authorized to find that Warren testified falsely as to a material issue, namely, whether he believed he was acting as a confidential informant at the time he committed the fraud with Studnicka. Warren does not suggest, nor could he, that the factual findings themselves are clearly erroneous. We see no error in the district court's discharge of its duty to make independent findings under the definition of perjury, *Dunnigan*, 507 U.S. at 87, as required to support the enhancement.

It follows from this conclusion that the court did not err by denying Warren credit for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines. The comments to § 3E1.1 state that conduct resulting in an enhancement for obstruction of justice "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, comment, n.4. Add to that the fact that the adjustment is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt," *id.* comment, n.2, and Warren faces an uphill battle. Warren maintains without elaboration that he accepted responsibility by stipulating that he sent the fraudulent checks to Studnicka. He also claims he should not be denied credit under § 3E1.1 because of his "genuine belief" that he was acting as a confidential informant. The district court's findings as to Warren's obstruction of justice, however, undercut such a theory. Moreover, Warren fails to explain what is extraordinary about his case, and he did put the government to its burden of proof by maintaining that none of his conduct was unlawful because he was acting as a confidential informant. It was thus not clearly erroneous for the district court to deny Warren points for acceptance of responsibility. *See Davis*, 442 F.3d at 1010.

**C. Jury Instructions**

That leaves Warren's cursory challenges to several jury instructions and the special verdict forms given in his case. Citing *Blakely v. Washington*, 542 U.S. 296 (2004), without any explanation of its applicability, he claims that three of the jury instructions should have required the government to prove beyond a reasonable doubt that his public authority defense was invalid. And without any citation at all, he claims it was improper for the court to admonish the jury not to consider Warren's possible sentence when reaching its verdict. Warren provides no argument to support his unelaborated claim that the pattern jury instructions he disputes were invalid, nor can we see any reason for finding as much. Likewise, he provides no authority to support his claim that the court's use of special verdict forms to determine actual and intended loss deprived him of a fair trial. Accordingly, he has waived any challenge to the jury instructions or the special verdict forms. *See United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("In this circuit, unsupported and undeveloped arguments are waived.").

**III.**

For the foregoing reasons, we AFFIRM Warren's convictions and sentence.

No. 05-2791                                                    19

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*