In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-1928

LORRI BIELANSKI,

*Plaintiff-Appellant,*

*v.*

COUNTY OF KANE, Illinois,
KANE COUNTY CHILD ADVOCACY
CENTER, KANE COUNTY CHILD
ADVOCACY ADVISORY BOARD, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 7291—**James B. Zagel,** *Judge.*

ARGUED APRIL 4, 2008—DECIDED DECEMBER 18, 2008

Before POSNER, KANNE and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Lorri Bielanski, at the age of fifteen, was falsely accused of sexually abusing a six-year-old neighbor. Eventually acquitted of all charges, she sued a number of public officials and entities for violating her constitutional rights during the investigation

and prosecution of the alleged crime. The district court dismissed her complaint in its entirety. We affirm.

## I.

On review of this dismissal under Federal Rule of Civil Procedure 12(b)(6), we accept as true all well-pleaded facts, and, drawing all inferences in favor of Bielanski, we review *de novo* whether the complaint states a claim for which relief can be granted. *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 471 (7th Cir. 2007); *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004); *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). Our recitation of the facts comes, therefore, from Bielanski's Second Amended Complaint. We begin by identifying the defendants. The Kane County Child Advocacy Center ("Center") and the Kane County Child Advocacy Advisory Board ("Board") are both legislatively created entities. *See* 55 ILCS 80/3, 80/4. The Center was created to coordinate the investigation, prosecution, and treatment referral of child sexual abuse. The Center is staffed by prosecutors, police investigators, investigators from the Illinois Department of Children and Family Services ("DCFS"), and case managers. The Board is composed of various government officials from Kane County, including representatives of the mental health department, the sheriff's office, the states attorney's office, and DCFS. The Board is responsible for drafting policies and procedures for investigating and prosecuting persons accused of child sexual abuse. In addition to suing the Center and the Board, Bielanski also sued the County of Kane, and two

persons, both individually and in their official capacities. Kathryn Byrne was a DCFS child protection investigator assigned to the Center, and David Berg was a police officer assigned to both the County of Kane and the Center. Byrne and Berg were both trained at the Child Advocacy National Training Program ("CANTP") in techniques for interviewing the child victims of sexual abuse.

On August 17, 2001, Byrne and Berg interviewed a six-year-old boy named "Brent" and his parents about an allegation that he had been sexually abused. Brent told Byrne and Berg that someone named Lorri had sexually abused him. The spelling of Lorri's name was provided by the adults involved in the case, interpreting the child's phonetic expression of the name. The interview lasted less than an hour and failed to conform to the forensic protocol taught at CANTP. The two investigators failed to video- or audiotape the interview. They failed to assess Brent's competency to testify, and they neglected to evaluate the accuracy of his memory. They did not assess whether he had fabricated the allegations or had been coached. They did not conduct a developmental assessment of Brent, did not investigate whether he had been previously interviewed (and if so, how many times), did not pursue any other possible explanations for the allegations, and did not speak to any other significant individuals in Brent's life. They did not evaluate the extent of his diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD") or how that diagnosis might affect his testimony, and they did not explore his motives. They interviewed the parents prior to interviewing the child, contrary to accepted forensic practice.

They did not employ any accepted procedure to identify the perpetrator of the alleged sexual abuse, such as photographs or drawings. They did not ask Brent to describe the physical features of the person who assaulted him.

Between August 17 and November 16, 2001, Byrne and Berg discovered that, prior to the interview, Brent was taking medication for ADHD and had been assigned to a special education class. They learned that he was a difficult child for his parents to control and discipline. In the summer of 2001, Brent had attended a day camp where he removed his clothing and attempted to remove the clothing of other children. In July of that same summer, a relative had complained to Brent's parents that Brent had attempted to force his cousins to undress in the back yard of Brent's home. In the weeks before the August 17 interview, Brent's parents angrily confronted him about the day camp and back yard incidents, and punished him and questioned him extensively about the incidents. During their questioning, Brent's parents suggested to him that perhaps someone had sexually abused him. Although Byrne and Berg knew all of this information, they made none of it available to Bielanski even though it was material to the validity and reliability of Brent's charge against Lorri at the August 17 interview.

Only six days after the interview, on August 23, 2001, Bielanski received notification from DCFS that credible evidence existed that she had committed acts of sexual penetration and sexual molestation upon Brent. DCFS labeled her the "indicated perpetrator." On November 16, 2001, the Kane County State's Attorney filed a Petition

for Adjudication of Wardship ("Petition"), alleging that Bielanski committed the Class X felony of aggravated criminal sexual assault and the Class 2 felony of aggravated criminal sexual abuse by committing an act of fellatio upon Brent and by placing her sexual organ on the sexual organ of Brent for the purpose of sexual gratification or arousal of the victim or the accused. As a result of the Petition, Bielanski was compelled to attend numerous court hearings, ordered to submit to an interview by a probation officer, and placed on pretrial restrictions which limited her freedom.

The matter came to trial in early 2003. During the prosecution's case-in-chief, Brent could not identify Bielanski in court, even after the judge directed Brent to look at Bielanski and asked him if he knew who she was. The court granted a defense motion for a directed finding of "not guilty." Bielanski then asked DCFS to expunge the charges against her from the agency's records. After a hearing before an administrative law judge, the director of DCFS ordered that the record be expunged. Bielanski maintained her innocence throughout the proceedings and her parents expended considerable resources retaining counsel and hiring investigators and a forensic expert to defend her.[1]

Bielanski filed a three-count complaint under 42 U.S.C. § 1983 (hereafter "Section 1983"), against the Center, the

---

[1] Bielanski's parents are not named as plaintiffs and therefore the amounts they expended defending their daughter may not be recovered in this suit.

Board, the County of Kane, Byrne, and Berg. Count I alleged that the defendants violated Bielanski's rights under the Fourth Amendment by compelling her to attend numerous court hearings and restricting her freedom when there was no probable cause to charge her with two felonies. Count I sought damages against all of the defendants. Count II asserted that Byrne and Berg (acting individually and in their official capacities) violated Bielanski's right to a fair trial and due process when they withheld exculpatory evidence from DCFS, the court, the prosecutors, and defense counsel. According to the complaint, this withholding of information caused the criminal prosecution of Bielanski, prolonged the proceedings, and deprived her of a fair trial. Count II sought damages against Byrne and Berg individually and in their official capacities. Count III maintained that, because of their inadequate policies, customs and practices, the County, the Center, and the Board enabled Byrne and Berg to violate Bielanski's rights. The complaint faulted the County, the Board, and the Center for failing to instruct, supervise, control, and discipline Byrne and Berg, and sought damages against all three of the institutional defendants.

The district court granted the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). In addition to the facts alleged in the complaint, the district court assumed that the only person in Brent's world named "Lorri" was his neighbor, Lorri Bielanski. The court noted that much of the complaint chastised the agencies for not adopting a particular protocol for investigating child abuse cases. The court found that the

Constitution does not require the agencies to adopt some particular protocol, and that the violation of a local policy is not enough to make out a constitutional claim. Rather, those violations might be compensable under state law. The court also remarked that, to the extent Bielanski sought damages for the amounts expended by her parents in her defense, there could be no recovery because her parents were not parties to the suit. What remained, according to the district court, was a claim for an illegal seizure without probable cause, a claim under *Brady* for failing to disclose exculpatory information, and a *Monell* claim dependent upon a finding that any constitutional violations by Byrne and Berg were caused by a failure of the agencies to properly train or supervise these employees. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The court concluded that a summons does not amount to an arrest, and that even if it did, Byrne and Berg would be entitled to qualified immunity on the illegal seizure claim. The court dismissed the *Brady* claim because it was "extinguished" by Bielanski's acquittal. That is, in order to make out a *Brady* claim, there must be a reasonable probability that the withheld evidence would have affected the outcome of the proceedings if Bielanski had known it before trial. Because Bielanski was acquitted, the revelation of the withheld information would not have changed the outcome. The court also found that, in most acquittals, a plaintiff will be unable to show damages unless the information would have destroyed the prosecution's case. The information withheld here, the court explained, would not have destroyed the

prosecution's case. The court also posited that the defendants would have been entitled to qualified immunity on the *Brady* claim. Because the claims against the individual defendants could not survive, the court also dismissed the *Monell* claim. Bielanski appeals.

## II.

On appeal, Bielanski contends that the district court erred when it construed the facts in favor of the defendants and inferred that there was only one person named "Lorri" in Brent's world.[2] She also argues that, under the "objectively reasonable" standard of the Fourth Amendment, she was seized without probable cause. Finally, she maintains that her acquittal did not render moot her claim that she was denied her due process right to a fair trial when the defendants withheld evid-

---

[2] We agree with Bielanski that the district court inappropriately construed the facts in favor of the defendants when it assumed that Bielanski was the only person named "Lorri" in Brent's world. On a motion to dismiss for failure to state a claim, we must construe the well-pleaded facts in favor of the plaintiff. *See Caremark,* 474 F.3d at 471. Bielanski alleged that the defendants failed to pursue alternative hypotheses and failed to gather information regarding significant individuals in Brent's life. The court should have construed this to mean that the defendants failed to investigate whether there was another person named "Lorri" (including alternate spellings of the child's phonetic representation of that name) in Brent's life. This error, however, does not affect the outcome of the case, and so we will not address it further.

ence that was exculpatory and could have been used for impeachment purposes. The court dismissed Bielanski's complaint under Rule 12(b)(6) for failure to state a claim, and our review is therefore *de novo*. *Minch v. City of Chicago*, 486 F.3d 294, 300 (7th Cir. 2007).

## A.

We begin with Bielanski's claim under Section 1983 that she was improperly seized without probable cause, in violation of the Fourth Amendment. In her complaint, she explains:

> Plaintiff was compelled by process to attend numerous court hearings, ordered to be interviewed by a probation officer, and was placed on pretrial restrictions which limited her freedom.

Second Amended Complaint (Complaint"), at ¶ 18(C). She did not describe in the Complaint the nature of the pretrial restrictions. In the district court, in response to the defendants' motion to dismiss, she explained that the "seizure" was the initiation of the prosecution, effected by a summons issued by the prosecutor, without probable cause. She did not name any other pre-trial restrictions in response to the motion to dismiss. On appeal, she adds that the pretrial restrictions consisted of an order not to leave Illinois without the permission of the court. She also explains on appeal that the interview with the probation officer was part of the seizure. Although she did not argue these latter two points in the district court, the defendants have not claimed waiver and have answered

those additional points in their briefs and at oral argument. On appeal, Bielanski concedes she was not arrested in the traditional sense of the word but instead was compelled by a summons to appear in court. She also asserts that, under the statute creating the Board and the Center, the investigative functions of the police department were merged with the prosecutorial functions of the state's attorney's office, which made the charging decision. Because of this merging of functions, she argues that it is not fatal to her claim that the prosecutor who caused the summons to be issued is not named as a defendant here.

In order to make out a claim under Section 1983 for an unreasonable seizure in violation of the Fourth Amendment, a plaintiff must allege, of course, that the defendants' conduct constituted a seizure, and that the seizure was unreasonable. *Belcher v. Norton*, 497 F.3d 742, 747 (7th Cir. 2007). We need not consider whether the seizure here was reasonable because our analysis begins and ends with the first component of this formulation: Bielanski was not seized as that term is understood in Fourth Amendment analysis. A seizure of a person is generally defined in terms of an intentional limitation of a person's freedom of movement. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1998) (a Fourth Amendment seizure occurs when there is governmental termination of freedom of movement by means intentionally applied); *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991) (a seizure of the person may be achieved by the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the person arrested; or, in the absence of

physical force, by submission to a show of authority); *Belcher*, 497 F.3d at 748 (a person is seized for Fourth Amendment purposes when, from all of the circumstances surrounding the incident, a reasonable person in the situation would believe he or she was not free to leave; to demonstrate seizure, individuals must show that they were touched by the police or that they yielded to a show of authority, and the governmental termination of freedom of movement must be intentional).

Bielanski argues that, under *Albright v. Oliver*, 510 U.S. 266 (1994), a claim for arrest without probable cause must be analyzed under Fourth Amendment jurisprudence. We have no quarrel with that general proposition, but Bielanski concedes she was not arrested as that term is commonly understood. Rather, she contends that, because of the unique way the Center operates (by combining police and prosecutorial functions into one organization), the conduct of the Center in charging her and causing a summons to be issued violated her right to be free of arrest without probable cause. She explains that the Board and the Center blurred the arrest role and the prosecution role to such a degree that, for Fourth Amendment purposes, arrest and prosecution are one and the same in her case. All of this begs the question of whether she was "seized" for Fourth Amendment purposes, that is, whether there was an intentional governmental termination of her freedom of movement.

Bielanski relies on Justice Ginsburg's concurrence in *Albright* for the proposition that a person who is obligated to appear for trial is "seized" for trial "when the

state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court." *Albright*, 510 U.S. at 279. Justice Ginsburg raised this issue in the context of a defendant who had been arrested and then released pre-trial, explaining that such a person "is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." 510 U.S. at 279. Justice Ginsburg urged the Court to adopt this concept of a continuing seizure to hold a police officer liable for the harm suffered by the defendant not only when he was arrested without probable cause, but when he was hailed into court because the officer then gave misleading testimony at the preliminary hearing. That testimony, Justice Ginsburg remarked, maintained and reinforced the unlawful hailing of the defendant into court, in her view perpetuating a Fourth Amendment violation past the initial seizure. *Id*.

No other Supreme Court justice has adopted Justice Ginsburg's analysis, and we have repeatedly rejected the concept of a continuing seizure in the Fourth Amendment context. *See Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006) (declining to recognize a stand-alone false confession claim based on a continuing Fourth Amendment violation theory); *Wiley v. City of Chicago*, 361 F.3d 994, 998 (7th Cir. 2004) (rejecting a claim for wrongful prosecution under a Fourth Amendment continuing seizure approach). We repeated in *Wallace* and *Wiley* our well-settled rule that "the interest in not being prosecuted groundlessly is not an interest that the Fourth Amendment protects." *Wallace*, 440 F.3d at 425; *Wiley*, 361

F.3d at 998 (both citing *Gauger v. Hendle*, 349 F.3d 354, 361 (7th Cir. 2003), *overruled in part by Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006)). Yet a claim for prosecution without probable cause is exactly the type of claim that Bielanski presses. Typically, the scope of a Fourth Amendment claim is limited up to the point of arraignment, at which point the prosecution is underway. *Wallace*, 440 F.3d at 425; *Wiley*, 361 F.3d at 998. If the prosecution is then deemed malicious, it "is not a constitutional tort unless the state provides no remedy for malicious prosecution." *Wiley*, 361 F.3d at 998 (quoting *Gauger*, 349 F.3d at 359). As Bielanski's counsel conceded at oral argument, Illinois provides a remedy for malicious prosecution and the plaintiff chose not to bring such a claim.

Bielanski urges us to find, nonetheless, that the summons requiring her to appear in court, an interview with a probation officer, and a court order requiring her to seek the permission of the court before leaving the state amounted to a seizure under the Fourth Amendment. Before the Supreme Court decided *Albright*, we expressed doubt that a requirement to appear in court is a sufficient deprivation of liberty to warrant the elevation of malicious prosecution to a constitutional tort. *Mahoney v. Kesery*, 976 F.2d 1054, 1060 (7th Cir. 1992). We noted that a court appearance is "less dramatic, less traumatic, than being arrested, or booked, the first usually involving being searched and handcuffed, the second being searched, fingerprinted, and photographed." *Mahoney*, 976 F.2d at 1060. *But see McCullah v. Gadert*, 344 F.3d 655, 661 (7th Cir. 2003) (reserving the question of whether a person was seized by a summons when he was taken into custody when he complied with the summons).

Other circuits have addressed whether a summons, alone or in combination with pre-trial restrictions, constitutes a seizure, and the answer varies, depending largely on the severity of the restrictions on freedom of movement. The Tenth Circuit declined to recognize a Fourth Amendment claim based on a groundless charging decision "absent a significant restriction on liberty." *Becker v. Kroll*, 494 F.3d 904, 915-16 (10th Cir. 2007). Becker was a physician subjected to a baseless investigation and prosecution for Medicaid fraud. Her records were subpoenaed, and she was threatened with criminal prosecution if she failed to pay a requested settlement, even though an independent review of her records demonstrated that she had not engaged in any wrongdoing. When Becker refused to settle, the state first filed a civil suit against her and then pursued criminal charges. She was subjected to a preliminary hearing and was bound over for trial, but was never taken into custody. The civil and criminal cases were dismissed but Becker was then subjected to an administrative proceeding that resulted in a finding that she had not engaged in fraud. Because Becker never was required to post bond or appear in court, and alleged no specific restrictions on her freedom of movement (such as travel restrictions), the court found that she was not seized for Fourth Amendment purposes. *Becker*, 494 F.3d at 915-16. *See also Kingsland v. City of Miami*, 382 F.3d 1220, 1235-36 (11th Cir. 2004) (finding no seizure for Fourth Amendment purposes when plaintiff was required to post $1000 bond, appear at her arraignment, and travel twice from New Jersey to Florida to defend herself in court); *Karam v. City of Burbank*, 352 F.3d 1188, 1193-94 (9th

Cir. 2003) (required signing of "own recognizance" agreement which obligated woman falsely accused of a misdemeanor to obtain court's permission before leaving state, and which compelled her appearance in court amounted to *de minimis* restrictions not constituting a Fourth Amendment seizure); *Nieves v. McSweeney*, 241 F.3d 46, 56 (1st Cir. 2001) (declining to find a seizure based on compelled presence at numerous pre-trial court appearances and at trial, in the absence of a required bond or travel restrictions); *Depiero v. City of Macedonia*, 180 F.3d 770, 798 (6th Cir. 1999) (finding no Fourth Amendment seizure where government conduct consisted of an officer issuing a citation that required a court appearance); *Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997) (refusing to apply Justice Ginsburg's continuing seizure theory to a claim of excessive force against pre-trial detainees, instead applying the Due Process Clause of the Fourteenth Amendment, and collecting cases that analyze at what point, short of arrest, an individual may have suffered a deprivation of personal freedom sufficient to implicate the Fourth Amendment).

Other courts have found a Fourth Amendment violation notwithstanding the absence of a physical seizure. The Third Circuit, for example, instead considers the severity of pre-trial restrictions as the determining factor. *DiBella v. Borough of Beachwood*, 407 F.3d 599, 602 (3d Cir. 2005). The court held that "[p]retrial custody and some onerous types of pretrial, non-custodial restrictions constitute a Fourth Amendment seizure." For example, in *DiBella*, the court held that there was no seizure where the plaintiffs had simply been issued summonses com-

pelling their appearance in court for trial. They were not arrested, they did not post bail, they were free to travel, and they were not required to report to pretrial services. The restraint on their liberty during court proceedings was not sufficient to raise a Fourth Amendment claim. 407 F.3d at 602-03. On the other hand, the court did find a Fourth Amendment seizure where a man was falsely charged with arson and mail fraud, and was subjected to more significant pre-trial restrictions. *See Gallo v. City of Philadelphia*, 161 F.3d 217 (3d Cir. 1998). After responding to a notice, Gallo was arraigned and then released on a $10,000 bond. He was not arrested, detained or handcuffed, but he was prohibited from traveling outside of New Jersey and Pennsylvania, and was required to contact pre-trial services on a weekly basis. *Gallo*, 161 F.3d at 219. These restrictions were in place for eight months before Gallo was acquitted of the charges. He was also required to attend court hearings, including his trial. The Third Circuit found that, although it was a close question, these pre-trial conditions amounted to a seizure. *Gallo*, 161 F.3d at 222-23. Finding Justice Ginsburg's concurrence in *Albright* compelling, the court was persuaded that the obligation to appear in court, enforced by the bond, and compounded by the travel restrictions and other conditions, had the effect of making Gallo "halt." 161 F.3d at 223.

The Fifth Circuit, like the Third, concluded that a summons, combined with certain onerous pre-trial restrictions, may constitute a seizure for Fourth Amendment purposes. *Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1999), *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d

939 (5th Cir. 2003). In response to a summons, Evans appeared in court to answer charges he later alleged were baseless. He was fingerprinted, photographed, and required to sign a personal recognizance bond. He was required to report to pretrial services once a month, was prohibited from traveling outside the state without the permission of the court, and was required to provide federal officers with financial and identifying information. 168 F.3d at 860-61. The court found that the summons, in combination with these pretrial restrictions, diminished Evans' liberty enough to render him seized under the Fourth Amendment. 168 F.3d at 861. However, because it was not clearly established that a summons and pretrial restrictions constituted a Fourth Amendment seizure, the court found the defendants were entitled to qualified immunity. 168 F.3d at 862.

The Second Circuit has held that "while a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and may order him to make periodic court appearances, such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment." *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997). The *Murphy* court upheld a verdict in favor of a plaintiff bringing a Fourth Amendment malicious prosecution claim against two police officers who signed spurious criminal complaints accusing the plaintiff of both misdemeanor and felony offenses. 118 F.3d at 942. To make out such a claim, the court required a plaintiff to show (1) the commencement or continuation of a criminal

proceeding by a defendant against a plaintiff; (2) a termina-
tion of the proceeding favorable to the plaintiff; (3) the
absence of probable cause for the proceeding; (4) actual
malice on the part of the defendant; and (5) a post-arraign-
ment deprivation of liberty guaranteed by the Constitution.
118 F.3d at 943. Noting the fundamental nature of a citi-
zen's right to travel from state to state, the court held that
a pre-trial restriction of that right has Fourth Amendment
implications. 118 F.3d at 945. The court also wrote ap-
provingly of Justice Ginsburg's concurrence in *Albright*,
finding that the eight trial court appearances required
of the plaintiff while the criminal charges were pending
also contributed to a finding of a post-arraignment depri-
vation of liberty under the Fourth Amendment. 118 F.3d
at 946.

Prior to the Supreme Court's opinion in *Albright*, we
rejected the concept of continuing seizure in a case involv-
ing police misconduct post-arrest and pre-charge. *Wilkins
v. May*, 872 F.2d 190, 194 (7th Cir. 1989). Wilkins was
arrested on suspicion of bank robbery. He alleged that,
during his interrogation, while he was handcuffed and
defenseless, an FBI agent pointed a gun at his head,
inflicting severe mental distress on him and causing him
to confess. Wilkins sued the FBI agent and his partner
under Section 1983, for violating his constitutional rights
by extracting his confession at gunpoint. On appeal, the
issue before us was whether Wilkins had sufficiently
alleged a constitutional deprivation. At the time of the
police misconduct, Wilkins had already been seized for
Fourth Amendment purposes because he had been ar-
rested. 872 F.2d at 192. A natural interpretation of the

word "seizure" might limit it to the initial act of seizing, and the Fourth Amendment clearly applies to that initial act. 872 F.2d at 192-93. We rejected the concept of a continuing seizure Fourth Amendment analysis for police conduct during a post-arrest, pre-charge interrogation because custodial interrogation "does not curtail a person's freedom of action; it presupposes that he has already lost that freedom." 872 F.2d at 194. Instead, we opined, the due process clause applied, and it was "for the trier of fact to decide whether a particular incident involving interrogation at gunpoint is so terrifying in the circumstances as to constitute a deprivation of liberty within the meaning of the due process clause." 872 F.3d at 195. We defined the relevant liberty interest as the freedom from severe bodily or mental harm inflicted in the course of an interrogation. 872 F.2d at 195.

We reaffirmed our rejection of the concept of a continuing seizure in *Reed v. City of Chicago*, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996), and *Lee v. City of Chicago*, 330 F.3d 456, 463 n.3 (7th Cir. 2003). Neither of those cases, however, are directly on point here because in each case there was a clear initial seizure. Reed was arrested and confined for twenty-three months prior to his acquittal for first degree murder. He brought his Section 1983 action for unlawful arrest, search, and seizure too late under the statute of limitations. He was left with claims for malicious prosecution and unlawful confinement against the arresting officers. We noted that, although the concept of continuing seizure was "intriguing," we had already rejected it in *Wilkins*. 77 F.3d at 1052 n.3. We affirmed the dismissal of Reed's claim because, at bottom, it was really a claim

that he was arrested and charged without probable cause, a claim that he conceded was time-barred. Lee alleged a Fourth Amendment claim for the seizure of his car as evidence in a case. He conceded that the initial impoundment of the car by the city was proper. The city subsequently refused to return the car when there was no longer a legitimate need to keep it unless Lee paid a fee. Citing *Reed* and *Wilkins*, we noted that Fourth Amendment seizure claims are temporally restricted to the initial deprivation. *Lee*, 330 F.3d at 465. Because Lee's complaint did not implicate the initial deprivation of his property but rather the fairness of the process that existed for subsequently recovering his property, we noted that due process analysis was a better fit for Lee's claim. 330 F.3d at 466.

The concept of continuing seizure is a poor fit for the facts of Bielanski's case, in any event, because to have a *continuing* seizure, one must have a seizure in the first place. In *Wilkins*, *Reed*, and *Lee*, there was an initial seizure at a single point in time, and the plaintiffs sought to recover for subsequent events. The application of the continuing seizure theory to our case still leaves us with the question of whether Bielanski was ever seized in the first instance. Bielanski, as we noted above, alleges three facts in support of her claim that she was seized for Fourth Amendment purposes: (1) she was compelled by process to attend numerous court hearings; (2) she was required to obtain the permission of the court before leaving the state; and (3) she was required to submit to an interview with a probation officer.

The Supreme Court "adhere[s] to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes. To hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim. *See Mahoney*, 976 F.2d at 1060. Although the travel restriction and the interview with the probation officer might be somewhat more onerous than the summons alone, we conclude that they are insufficient restraints on freedom of movement to constitute a seizure. The First Circuit remarked in *Nieves* that "if the concept of a seizure is regarded as elastic enough to encompass standard conditions of pretrial release, virtually every criminal defendant will be deemed to be seized pending the resolution of the charges against him." 241 F. 3d at 55. The court opined that garden-variety malicious prosecution cases were better left to the state courts. *Id*. The conditions imposed on Bielanski were not the "dramatic" or "traumatic" conditions we mentioned in *Mahoney*. 976 F.2d at 1060. No doubt being falsely accused of molesting a child was itself traumatic, and a state court malicious prosecution claim would have addressed that injury, but a false accusation is not a seizure. For the travel restriction, Bielanski does not claim that the court denied her any request to travel outside the state, only that she was required to request permission. Such a requirement is, at most, a precursor to a possible seizure rather than a

seizure itself. The single required meeting with a probation officer is the type of standard condition of pretrial release that is not onerous enough to constitute a seizure. 241 F.3d at 55. Most importantly, we have stated that the Fourth Amendment "drops out of the picture following a person's initial appearance in court." *Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006). The travel restriction and the meeting with the probation officer were restrictions imposed by a judge once Bielanski appeared in court, and so a Fourth Amendment claim against these defendants cannot stand. In short, Bielanski has failed to allege a seizure (continuing or otherwise) by these defendants and thus has no claim under the Fourth Amendment.

**B.**

We turn next to Bielanski's claim that she was denied the right to a fair trial when the defendants withheld exculpatory and impeaching evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Bielanski alleged that, between August 17, 2001 and November 16, 2001, Berg and Byrne learned a number of facts that were exculpatory but did not turn any of this information over to DCFS, prosecutors, the juvenile court, and Bielanski's defense counsel. Specifically, Bielanski alleged that Berg and Byrne knew that Brent was medicated for Attention Deficit Hyperactivity Disorder (ADHD) and was assigned to special education classes; that Brent's parents had difficulty controlling and disciplining him; that in the summer of 2001, Brent had disrobed at summer camp

and attempted to disrobe other children; that in July 2001, Brent's parents angrily confronted him after learning from relatives that Brent had attempted to disrobe his cousins; and that following the disrobing incidents, Brent's parents punished him and questioned him in a manner that suggested to him that someone had sexually abused him. According to Bielanski, all of this information was material to the validity and reliability of Brent's statement that "Lorri" had sexually abused him. The district court found that a *Brady* claim is extinguished by an acquittal because the disclosure of the evidence would not have changed the outcome of the trial. The court remarked that the *Brady* analysis was difficult enough in the face of a conviction, when the court then has to determine whether the evidence would have changed the outcome. In the case of an acquittal, a court has to determine whether, assuming the defendant had been convicted (which she had not), the exculpatory evidence would have led to an acquittal. In most cases of acquittal, the court stated, there will be no damages unless the withheld information would have destroyed the prosecution's case. The court held that the revelation of the additional evidence would not have destroyed the prosecution's case. That is, this information would not have led to the pre-trial dismissal of the charges against Bielanski.

"A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). The *Brady* duty extends to impeachment evidence as well as exculpatory evidence. *Youngblood*, 547 U.S. at 870. And a court may find that a *Brady* violation has occurred even

when the suppressed evidence is known only to police investigators and not to the prosecutor. *Id.*; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). *See also Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008) (in order to make out a *Brady* claim, a plaintiff must demonstrate that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; that the evidence was suppressed by the government, either willfully or inadvertently; and that the evidence was material, that is, that there is a reasonable probability that prejudice ensued); *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (same). On appeal, the only part of the *Brady* formulation at issue is whether the evidence in question was material. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). In discussing the difference between the "reasonable probability" standard and a preponderance standard, the Court explained:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434. A defendant may demonstrate a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such

a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

The Supreme Court has yet to address the situation alleged here, where certain evidence was withheld by the prosecution and yet the defendant was still acquitted. The government argues that there can be no *Brady* violation in the face of an acquittal. Bielanski maintains that an acquittal does not extinguish a *Brady* claim because a defendant might be acquitted even after an unfair trial, and the failure of the prosecution to reveal this evidence in a timely fashion damaged her by unnecessarily prolonging the proceedings. The district court opined that revelation of the evidence in question would not have shortened the proceedings, and we agree. Although the evidence could have been used to impeach Brent's credibility and offer an alternate explanation for his charge against Bielanski, the withheld evidence was not of the nature to cause a prosecutor to drop the charges entirely.

Several of our sister circuits to consider the question have concluded that a *Brady* claim is extinguished when a defendant is acquitted or charges are dropped. *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) (finding no *Brady* violation in the face of an acquittal because *Brady* protects a defendant from an unfair trial and an acquitted defendant does not suffer the effects of an unfair trial); *McCune v. City of Grand Rapids*, 842 F.2d

903, 907 (6th Cir. 1988) (where criminal charges are dropped before trial, and thus the underlying criminal proceeding terminated in an appellant's favor, there is no injury caused by the act of suppressing exculpatory evidence). *But see Haupt v. Dillard*, 17 F.3d 285, 287-88 (9th Cir. 1994) (where trial judge was biased, defendant's acquittal speaks only to the amount of damages due and is irrelevant to whether he has a cause of action for a violation of his due process right to a fair trial).

We very recently expressed doubt in *Carvajal* "that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation." 542 F.3d at 570. We noted that the Supreme Court measured *Brady* materiality by whether the nondisclosure was so serious that the suppressed evidence would have produced a different verdict. *Carvajal*, 542 F.3d at 570 (citing *Strickler*, 527 U.S. at 289-90). We took this to mean that, although a prosecutor must decide whether evidence is *Brady* material prospectively, "a true constitutional violation is measured with the outcome in mind." 542 F.3d at 570. Nonetheless, we analyzed the claim to determine whether, in part, "the decision to go to trial would have been altered by the desired disclosure." 542 F.3d at 569. We concluded there, as we do here, that the decision to go to trial would not have been affected by the allegedly withheld evidence.

*Brady* requires that the government disclose material evidence in time for the defendant to make effective use of it at trial. *See Warren*, 454 F.3d at 761. Even late disclosure does not constitute a *Brady* violation unless the defendant is unable to make effective use of the evidence.

*Warren*, 454 F.3d at 760. *See also Moore v. Casperson*, 345 F.3d 474, 493 (7th Cir. 2003) (nothing in *Brady* requires that disclosures be made before trial because, as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence, due process is satisfied); *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001) (*Brady* demands only that the disclosure not come so late as to prevent the defendant from receiving a fair trial). Under these cases, *Brady* evidence can be handed over on the eve of trial or even during trial so long as the defendant is able to use it to his or her advantage. That said, purposefully withholding exculpatory or impeaching evidence until the last moment would be a risky and ethically questionable practice for government agents to undertake, and we certainly do not condone that approach with our opinion today. We hasten to add that there is no allegation here that the prosecution purposefully withheld the subject evidence.

Earlier disclosure of this evidence would not have resulted in dismissal of the charges prior to trial. For the most part, the evidence is impeaching rather than exculpatory and its use in cross-examination of the investigators and the accuser certainly would have created credibility issues for the trier of fact to resolve. The evidence weakened parts of the prosecution's case but was not the type of evidence that would have precluded the charges entirely. And Bielanski ultimately had a trial which resulted in a verdict "worthy of confidence." *Kyles*, 514 U.S. at 434. *See also Bagley*, 473 U.S. at 675 (the purpose of the *Brady* rule is "to ensure that a miscarriage of

justice does not occur"). Because Bielanski did not suffer the harm that *Brady* aims to prevent, we therefore conclude there was no *Brady* violation here.

### III.

In sum, Bielanski has failed to allege a Fourth Amendment claim because she was not seized when she was summoned to trial before the juvenile court and subjected to minimal pre-trial restrictions. And she has failed to allege a *Brady* due process claim because the undisclosed favorable evidence would not have resulted in earlier dismissal of the charges and could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. At bottom, Bielanski has alleged a claim for malicious prosecution that is more appropriately brought in state court. *See Wiley*, 361 F.3d at 998. Because her *Monell* claim depended entirely on the validity of her first two claims, we affirm the dismissal of the *Monell* claim as well.

AFFIRMED.