In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2081

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH DIEKEMPER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 08-30139-01—**G. Patrick Murphy**, *Judge.*

ARGUED JANUARY 11, 2010—DECIDED APRIL 28, 2010

Before EASTERBROOK, *Chief Judge*, and KANNE, *Circuit Judge*, and KENNELLY, *District Judge.**

KANNE, *Circuit Judge.* Joseph Diekemper pled guilty to conspiracy to commit bankruptcy fraud, conspiracy to commit mail fraud, making false statements for the pur-

---

* The Honorable Matthew F. Kennelly, judge for the United States District Court for the Northern District of Illinois, sitting by designation.

pose of influencing the United States Department of Agriculture ("USDA") Commodity Credit Corporation, and perjury. Diekemper's wife and co-conspirator, Margaret Diekemper, was sentenced first and received two years' probation for her involvement in the conspiracy. As a condition of that probation, Mrs. Diekemper was prohibited from all contact with her husband during those two years. Diekemper was sentenced subsequently, and after receiving a four-level enhancement for his leadership role, he received a within-guidelines sentence of 120 months' imprisonment.

Diekemper appeals his sentence, alleging that (1) his wife's probation condition violates his fundamental right to a marital relationship; (2) the district court judge's failure to recuse himself for bias violates Diekemper's right to due process; (3) the district court's application of the sentencing enhancement was in error; and (4) the district court's failure to weigh all of the sentencing factors in 18 U.S.C. § 3553 was in error. We affirm.

## I. BACKGROUND

Joseph and Margaret Diekemper were dairy farmers who had been married for thirty-five years. The couple filed for bankruptcy in May 2004. For close to four years thereafter Diekemper engaged in a scheme to conceal assets from the bankruptcy court. Eventually the government discovered Diekemper's conduct and indicted him on twenty-one counts. He ultimately pled guilty to five of the charged counts.

At Diekemper's plea hearing, he signed a stipulation of facts admitting to a variety of illegal conduct, including: undervaluing property and assets by more than 2.5 million dollars, hiding farm equipment on friends' properties, titling and selling vehicles and equipment in others' names, using the mail service to effectuate these transfers, failing to disclose financial information to the bankruptcy trustee, fraudulently obtaining agricultural subsidies from the USDA, and urging others to lie under oath during his bankruptcy proceedings. In the interim between Diekemper's plea hearing and his sentencing hearing, Mrs. Diekemper was sentenced for her participation as a co-conspirator in the scheme. A condition of her two-year probation was that she refrain from all contact with Diekemper during those two years.

One month after Mrs. Diekemper's sentencing, Diekemper had his own sentencing hearing. During that hearing, Diekemper did not challenge his wife's probation condition. (*See* Appellee's App. at 39) ("[M]y understanding of the ruling was that [Mrs. Diekemper] was not permitted contact. . . . And I can stand here and question the validity of that judgment, I'm not going to do that." (statement by Diekemper's counsel)). But Diekemper did contest the four-level enhancement to his sentence for his role as the organizer of an extensive criminal activity, pursuant to U.S.S.G. § 3B1.1(a). Ultimately, however, the district court found the four-level enhancement appropriate and sentenced Diekemper to 120 months' imprisonment for his mail fraud and 60 months' imprisonment on each of the other counts, with each sentence to run concurrently.

## II. ANALYSIS

Diekemper now challenges various aspects of his sentencing. We address each of his contentions in turn.

### A. *Mrs. Diekemper's Probation Condition*

Diekemper first argues that his wife's probation condition violates his fundamental right to a marital relationship. Although the government urges us to find that Diekemper waived this argument through his attorney's statement at sentencing (and indeed, he may have), we need not address the issue of waiver because Diekemper's argument is not properly before us in the first instance, and in any event, Diekemper lacks standing to pursue it.

To raise a claim before an Article III court, a litigant must present a case or controversy that can be properly adjudicated by the federal courts. *O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th Cir. 2005). To be properly before the federal courts, a litigant must have timely appealed a final judgment, *see generally* Fed. R. App. P. 3-4; *Fairley v. Andrews*, 578 F.3d 518, 521 (7th Cir. 2009) ("The only prerequisites to appellate jurisdiction are a final judgment and a timely notice of appeal."), and have standing to raise the challenged issue, *Michigan v. U.S. Environmental Protection Agency,* 581 F.3d 524, 528 (7th Cir. 2009). A litigant has standing when he demonstrates: "(1) an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;

(2) a causal connection between the injury and the conduct complained of . . . ; and (3) a favorable decision will likely redress the injury." *O'Sullivan*, 396 F.3d at 854 (internal quotation marks omitted).

Diekemper's argument fails at its inception because the probation condition with which he takes issue was decided in an entirely different case. He is appealing the final judgment in his own case, *not* the final judgment in Mrs. Diekemper's case. Mrs. Diekemper neither took issue with her probation condition nor appealed her sentence. And that judgment is not now before us. We therefore have no ability to reach the probation condition because the judgment imposing that condition is not on appeal.

Even assuming that we could examine Mrs. Diekemper's probation condition, we fail to see how Diekemper can prove causation and redressability, which, for purposes of this case, seem readily intertwined. Although the condition was imposed on his wife's probation, Diekemper argues that he has standing because his marriage is affected by the terms of that condition; in essence, he seems to argue that being "affected" by the condition is enough to satisfy the three standing requirements. But what Diekemper fails to realize is the mere fact that he may suffer the effects of his wife's probation condition does not confer upon him Article III standing.

Diekemper is currently serving a prison sentence of 120 months. Without some affidavit from Mrs. Diekemper that absent her probation condition she would visit her husband, we have no way of knowing that she would in

fact do so. Without any corroboration, Diekemper's own statement that his marriage is affected because his wife cannot visit him is unavailing. We are not at the pleading stage of the case, where general allegations of fact are enough to withstand a challenge. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005). Instead, "each element [of standing] . . . must be supported by more than unadorned specula-tion." *Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir. 2001).

Certainly, the district court's sentence prohibiting Mrs. Diekemper from seeing her husband *could* be the reason she will have no contact with Diekemper for two years. But again, without some statement from Mrs. Diekemper to that effect, we have no way of knowing whether, in the absence of that condition, she actually *would* contact her husband. *See Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999) (explaining that standing requires "a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defen-dant and not from the independent action of some third party not before the court.").

And because they are so intertwined in this case, Diekemper's failure to show causation also amounts to a failure to demonstrate redressability. In the absence of a causation showing, we simply cannot assume that if we were to remand the injury complained of would be remedied. *Plotkin*, 239 F.3d at 885 (stating specifically that redressability must be proven). In fact, a sufficient

remedy would unlikely be available even if causation were present because a remand would amount to a full resentencing, yet again subject to the district court's broad discretion—which includes the discretion to resentence Mrs. Diekemper thus preventing her from seeing her husband through incarceration. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (noting that when a claim depends on the independent actions of third parties, standing will be hard to satisfy). Because there are numerous deficiencies in his argument, Diekemper's challenge to his wife's probation condition must fail.

### B. Recusal

Diekemper also asserts that the district court judge's failure to recuse himself for bias violated Diekemper's rights to due process and the recusal statute, 28 U.S.C. § 455. In the context of § 455, our standard of review varies based on the claim. In this circuit, review of a decision denying recusal under § 455(a) must be sought immediately through a writ of mandamus or it is waived. *United States v. Troxel*, 887 F.2d 830, 833 (7th Cir. 1989). As for claims arising under § 455(b), if a claim is properly preserved, our review is *de novo. United States v. Balistrieri*, 779 F.2d 1191, 1203 (7th Cir. 1985). "It is less clear under our case law whether we may review a refusal to recuse under section 455(b) when the argument is raised for the first time on appeal," but assuming that we can, that review will be for clear error. *United States v. Smith*, 210 F.3d 760, 764 (7th Cir. 2000).

Diekemper failed to raise the issue of recusal before the district court but nonetheless argues that the district court judge had a duty to recuse himself sua sponte. As evidence of the district court judge's bias toward him, Diekemper points to statements made both during Mrs. Diekemper's sentencing and his own. Because Diekemper argues for recusal under both § 455(a) and (b), we will address each in turn.

*1. Section 455(a)*

Under § 455(a), Diekemper argues that because the judge's bias toward him first became apparent during his wife's sentencing, he was unable to raise the issue of recusal at the district court level. Although we have not had occasion to hold explicitly that a defendant may make a motion for recusal in the interim between trial and sentencing, in dicta we have permitted a judicial bias concern to be raised after trial when the bias did not become known until the trial's cessation. *United States v. Ward*, 211 F.3d 356, 364 (7th Cir. 2000) (deciding the bias issue on the merits rather than on waiver grounds, and therefore implicitly allowing the claim to be raised).

In this case, Mrs. Diekemper's sentencing was held more than one month before Diekemper's. Diekemper does not argue that he had insufficient time to seek a recusal, but rather that he thought a recusal motion was unavailable to him because of no express guidance on this issue. We think *Ward* provides at least some notice of the potential availability of post-trial recusal motions, but even if it does not, Diekemper has no ex-

planation for his failure to follow proper § 455(a) proce-
dures. In fact, he concedes that our review is limited
to cases in which mandamus is sought, but instead of
following that procedure, he merely argues that we
should adopt a different procedure.

We hold firm to our position that mandamus must be
sought for a § 455(a) claim of bias to be preserved
properly for appeal. This conclusion follows from the
very nature of § 455(a) claims, which seek to prevent the
appearance of bias and to preserve the public's faith in
the judicial process. *Brokaw v. Mercer County*, 235 F.3d
1000, 1025 (7th Cir. 2000); *Troxel*, 887 F.2d at 833-
34. Section 455(a) provides: "Any justice, judge, or magis-
trate judge of the United States shall disqualify himself
in any proceeding in which his impartiality might rea-
sonably be questioned." Once the proceedings at issue
are concluded, a post hoc motion for recusal will do
little to remedy any appearance of bias that was present.
*Troxel*, 887 F.2d at 833; *see also Durhan v. Neopolitan*, 875
F.2d 91, 97 (7th Cir. 1989). Because Diekemper did not
file a motion for mandamus at the time he became
aware of the alleged bias, any remedy to the appearance
of bias that may have existed has long since evaporated.
Diekemper's § 455(a) claim fails.

### 2. *Section 455(b)*

Diekemper's § 455(b) claim fails for a different reason.
In claims arising under § 455(b), the mere fact that a
judge forms a negative opinion of a litigant during the
course of a proceeding does not, by itself, constitute bias.

*In re Huntington Commons Assocs.*, 21 F.3d 157, 158 (7th Cir. 1994) (*quoting Litkey v. United States*, 510 U.S. 540, 555-56 (1994)). Unless those opinions "'display a deep-seated favoritism or antagonism that would make fair judgment impossible,'" a judge does not run afoul of § 455(b). *Id.* Looking at the four statements Diekemper alleges demonstrate improper bias, we are unable to say that they express the sort of "deep-seated" favoritism or antagonism that make fair judgment impossible.

With regard to the statements made at Diekemper's sentencing, we think these merely reflect an opinion of Diekemper that the judge formed during the course of trial. The statement that Diekemper was not the first farmer to try to "weasel out of" some honest debts adequately reflects the facts of the case and the district court judge's experience. Contrary to Diekemper's contention, it does not rise to the level of deep-seated antagonism found in *Berger v. United States*, 255 U.S. 22, 28-29 (1921), where the judge, an American during the World War I era, railed about German-Americans and their disloyalty in a case involving defendants of German descent. Although Diekemper tried to analogize *Berger* to his own case by alleging that the district court judge was biased against a "class" of cheating farmers, we think this comparison misses the mark.

The statement that Diekemper is "manipulative, narcissistic, and twisted," similarly is a reflection of the facts before the district court. This statement further served to explain why the judge imposed the sentence that he did. And as the government points out, this statement

is similar to calling a defendant "Madame Cocaine," a "kingpin," or "not a nice person"—all of which are statements we found proper in *Troxel*, 887 F.2d at 834, and *United States v. White*, 582 F.3d 787, 807 (7th Cir. 2009).

And while the statements made at Mrs. Diekemper's sentencing give us a bit more pause, they do not reflect the sort of "antagonism that would make fair judgment impossible." The judge first commented that the couple's marriage was "unfortunate." This statement was made in the context of the district court's explanation of the no-contact condition, and viewed in that light, it adequately serves as the basis for the finding that Mrs. Diekemper would not have engaged in criminal conduct but for her husband's influence. The judge clearly was under the impression that to rehabilitate Mrs. Diekemper he had to protect her from her husband's manipulation, and this statement is evidence of that belief.

More questionable is the judge's statement that had Mrs. Diekemper been raised during the modern era, she likely would have "shot" Diekemper for urging her to lie during the proceedings. Although when taken out of context this statement seems inflammatory, that is not the case when read in conjunction with the whole transcript. The judge was explaining why Mrs. Diekemper acquiesced in her husband's suggestion to lie, a statement he credited to what he considered to be the general subservience of women born to her generation. In context, this statement reflects the judge's belief that Mrs. Diekemper lied because of her upbringing and inability to escape her husband's control, rather than

because of some illicit motivation. This statement does not run afoul of § 455(b)'s standards.

Because the district court judge was neither biased for purposes of § 455(a) nor unable to render fair judgment under § 455(b), Diekemper's appeal on this issue fails.

### C. *Sentencing Enhancement*

The district court applied a four-level sentencing enhancement after determining that Diekemper exercised a leadership role in the conspiracy. Although Diekemper conceded that a two-level enhancement was appropriate because he was an organizer, leader, and manager, he argued that the facts relied upon as the basis for the finding that his criminal activity was "otherwise extensive" resulted in double counting. On appeal, he persists with that argument, but now raises the additional arguments that the court improperly relied on a finding of five or more participants and that in any event, the evidence was insufficient to support the district court's findings on the other factual bases. We review the district court's interpretation of the sentencing guidelines *de novo*, *United States v. Tai*, 41 F.3d 1170, 1174 (7th Cir. 1994), and its factual finding for clear error, *United States v. Hart*, 226 F.3d 602, 604 (7th Cir. 2000).

U.S.S.G. § 3B1.1 provides: "Based on the defendant's role in the offense, increase the offense level as follows: (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants

or was otherwise extensive, increase by 4 levels . . . ." In this case, Diekemper concedes that he was an organizer or leader, but takes issue with the district court's findings regarding the latter part of the enhancement. We see no merit to Diekemper's arguments.

First, Diekemper claims that the district court erred in finding that there were five or more participants. This argument is unworthy of much discussion because the district court never made such a finding. Instead, the district court found that the enhancement applied because the scheme was "otherwise extensive." And although in its analysis the court stated, "you have the number of participants," the court goes on to say that the "government doesn't press the point . . . instead [it] focuses on the question of whether this is extensive." (Appellee's App. at 16.) In fact, the court made an express finding in which it explained that its ruling was based on the otherwise extensive prong. It is obvious to us that the court was simply using the number of participants as a factor to support extensiveness rather than as an ultimate conclusion.

Second, Diekemper claims that the evidence was insufficient to support a finding of extensiveness because the court relied on an "insufficient head count" and on factors which are otherwise accounted for under other sentencing enhancements. Initially, we note that the district court did not rely on a headcount to make the finding of extensiveness. But even if it did, this argument would fail because § 3B1.1 does not require a minimum headcount to find that a criminal scheme was otherwise extensive. *United States v. Miller*, 962 F.2d 739,

745 (7th Cir. 1992) (*citing United States v. DeCicco*, 899 F.2d 1531, 1536 (7th Cir. 1990)).

In any event, the district court did not use a headcount in its finding; rather, it considered various factors in determining extensiveness; namely, that the scheme took place over an extended period of time, involved a large amount of money, was highly orchestrated, and utilized the assistance of several other people throughout the conspiracy's existence. This method of computing extensiveness is entirely proper, as case law cited in Diekemper's own brief illustrates. For example, in *United States v. Don Jin Chen*, 497 F.3d 718, 722 (7th Cir. 2007), we opined that "otherwise extensive" activity existed where the scheme affected many victims, involved a lot of money, and the leader "regularly relied upon the assistance of both named coconspirators and various unidentified [persons]." These are almost identical factors to those utilized by the district court in this case. Although in *Don Jin Chen* the court relied on the number of victims rather than the lengthiness of the scheme, we see no reason that lengthiness of the conspiracy cannot be considered. Additionally, in *Miller*, 962 F.2d at 745, we found that two participants, four outsiders, and a fraud involving more than $658,000 was "otherwise extensive." In Diekemper's case, there were three knowing participants, six outsiders, and the loss involved more than 2.5 million dollars. Surely this constitutes an extensive scheme.

But Diekemper argues that the use of these factors is improper because they are accounted for elsewhere in

the sentencing guidelines. As support for this, he relies upon an abrogated Second Circuit case, *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997), where that court stated that the amount of loss, extent of planning, and the number of victims may be accounted for elsewhere in the guidelines. Importantly, however, the court also went on to explain that "it is possible that some factors considered elsewhere in the Guidelines might still be properly counted towards 'extensiveness' in cases where the defendant's conduct so far exceeds the contemplation of the otherwise applicable Guideline." *Id.* at 803.

We start our analysis with the rule itself. Double-counting occurs only if " 'precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.' " *United States v. Gibson*, 409 F.3d 325, 340 (6th Cir. 2005) (*quoting United States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999)). In this case, Diekemper pled guilty to two conspiracy charges, making false statements, and perjury. None of these offenses, by their terms, focus on the large-scale nature of a defendant's scheme or his manipulation of unwitting participants. Therefore, because the underlying crimes are concerned with different harms than the enhancement, application of this enhancement did not result in double counting. And, in any case, "the consensus among all of the other circuits, including our own, is that double counting is permissible unless the Guidelines expressly provide otherwise or a compelling basis exists for implying such a prohibition." *United States v. Harris*, 41 F.3d 1121, 1123 (7th Cir. 1994); *see also United States v. Porretta*, 116 F.3d 296, 301 (7th Cir.

1997). Therefore, "[d]ouble counting is permissible if it accounts for more than one type of harm caused by the defendant's conduct, or where each enhancement of the defendant's sentence serves a unique purpose under the guidelines." *United States v. Parker*, 136 F.3d 653, 654 (9th Cir. 1998).

But even if we were to examine this set of facts under the Second Circuit's approach (which is not binding on us in any event), Diekemper's conduct took place over several years, involved the assistance of many participants, was carefully orchestrated, and involved continual fraud upon the system in an effort to hide 2.5 million dollars. We think this conduct certainly exceeds the "contemplation of the otherwise applicable Guidelines." Diekemper's argument is without merit.

## D.  Relevant Sentencing Factors

Finally, Diekemper argues that the district court failed to consider meaningfully the arguments Diekemper offered in mitigation of his sentence under 18 U.S.C. § 3553(a). We review a district court's application of the sentencing guidelines *de novo*, *United States v. Warren*, 454 F.3d 752, 762 (7th Cir. 2006), but on appeal, a within-guidelines sentence receives a presumption of reasonableness, *United States v. Harris*, 490 F.3d 589, 596-97 (7th Cir. 2007).

Diekemper argues that the district court failed to consider fully his criminal history, age, and family circumstances. Diekemper asserts that his criminal history and

age make his likelihood of recidivism minimal, and that the district court itself acknowledged this, yet refused to apply a below-guidelines sentence. We think the fact that the district court acknowledged this argument is dispositive—as long as a sentencing court considers the arguments made in mitigation, even if implicitly and imprecisely, the sentence imposed will be found reasonable. *United States v. Poetz*, 582 F.3d 835, 839 (7th Cir. 2009).

As for Diekemper's family circumstances, Diekemper argues that the tragic loss of his son due to a farming accident caused Diekemper to attempt to save his farm at any cost. In support of this argument, he points to *United States v. Schroeder*, 536 F.3d 746, 755-56 (7th Cir. 2008), where we found that extraordinary family circumstances may constitute a valid basis for a below-guidelines departure. But *Schroeder* is inapplicable here because the district court did consider Diekemper's argument. It simply chose to reject that argument because it found that Diekemper's illegal conduct was not causally connected to efforts to save the farm. In fact, the district court found that Diekemper's bankruptcy fraud was motivated by a gambling addiction, rather than a more noble effort to save his farm. Because the court considered Diekemper's arguments in mitigation of his sentence, we find the imposed sentence reasonable.

Lastly, Diekemper argues that the court erred when it did not explain its decision to impose the statutory maximum for conspiracy to commit mail fraud as opposed to the statutory maximum for conspiracy to commit

bankruptcy fraud. Yet Diekemper cites no law in support of this argument, and it was therefore within the district court's discretion to reject it. *See United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005); *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("In this circuit, unsupported and undeveloped arguments are waived."). Diekemper's § 3553 arguments fail.

### III.  CONCLUSION

Because Diekemper's arguments are meritless, the decision of the district court is AFFIRMED.