In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2607

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN FEENEY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00794-1 — **Jorge L. Alonso**, *Judge.*

ARGUED DECEMBER 13, 2023 — DECIDED APRIL 30, 2024

Before WOOD, KIRSCH, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* John Feeney pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and carrying an explosive during that unlawful possession in violation of 18 U.S.C. § 844(h)(2). At sentencing, the parties disagreed on the applicable base offense level under the Sentencing Guidelines for Feeney's § 922(g)(1) conviction. The government argued that Feeney's possession of an explosive warranted an increased base offense level under

U.S.S.G. § 2K2.1(a)(5). Meanwhile, Feeney argued that this outcome would punish him twice for the same conduct in violation of Application Note 4 to U.S.S.G. § 2K2.4. The court agreed with the government and applied the higher base offense level to Feeney's sentence. Because Feeney has the better interpretation of the relevant guideline and application note, we vacate his sentence and remand for resentencing.

### I.  Background

On July 24, 2020, officers with the Grundy County Sheriff's Department received information that Feeney may have been involved in a roadside shootout. The next day, a sergeant began conducting surveillance of Feeney's residence. After observing Feeney drive away from his house and commit multiple traffic violations, the sergeant pulled him over. During the stop, Feeney was asked to step out of his car and stand at the rear, but instead he ignored the request, locked his car, and walked away. The sergeant and another deputy who arrived on the scene eventually caught up to Feeney, searched his vehicle, and found two pistols, ammunition, drugs, and drug paraphernalia. They also found three artillery-shell fireworks, one of which Feeney had modified to contain metal shrapnel.

In a four-count superseding indictment, the government charged Feeney, a convicted felon, with unlawfully possessing the two pistols pursuant to 18 U.S.C. § 922(g)(1) and with carrying explosives—the fireworks shells—while committing that felony pursuant to 18 U.S.C. § 844(h)(2). Feeney pleaded guilty to both offenses.

In anticipation of sentencing, the probation office prepared a presentence investigation report (PSR). As to the

§ 922(g)(1) conviction, the PSR set a base offense level of 14 under U.S.S.G. § 2K2.1(a)(6). The PSR then applied two specific offense characteristics. First, it applied a two-point increase pursuant to U.S.S.G. § 2K2.1(b)(4) because one of the firearms was stolen. Second, it applied a four-point increase pursuant to § 2K2.1(b)(6)(B) because Feeney possessed the firearms in connection with another felony (here, drug trafficking). After a three-level reduction for acceptance of responsibility, Feeney's total offense level was 17. With a criminal history category of IV, the PSR recommended a guideline range of 37 to 46 months of imprisonment. As to the conviction for carrying explosives while committing a felony, the PSR calculated the guideline sentence to be the statutory 10-year minimum under § 844(h)(2). *See* U.S.S.G. § 2K2.4(a).

Both parties objected to the offense-level calculation for the § 922(g)(1) conviction. They reasoned that Application Note 4 to § 2K2.4 and our holding in *United States v. Foster*, 902 F.3d 654 (7th Cir. 2018), prohibited the court from applying specific offense characteristics under § 2K2.1(b)(4) and § 2K2.1(b)(6)(B).

The government also objected to the PSR's base offense level of 14 for Feeney's § 922(g)(1) conviction. In the government's view, Feeney's base offense level should have been 18 under § 2K2.1(a)(5) because the offense also involved a "firearm"—the modified firework shell—as described in 26 U.S.C. § 5845(a). Consistent with the PSR, Feeney maintained that Note 4 to § 2K2.4 precluded the court from applying an enhanced base offense level based on an explosive or weapon when formulating his § 922(g)(1) sentence.

At the sentencing hearing, the district court agreed that Note 4 in § 2K2.4 prohibited applying the specific offense

characteristics under § 2K2.1(b). But it sided with the government regarding the base offense level, reasoning that Note 4 only prohibits the court from applying weapon-related specific offense characteristics to the underlying sentence. As a result, the court calculated the total offense level for the § 922(g)(1) conviction to be 15 (a base offense level of 18 reduced by 3 levels for acceptance of responsibility). Combined with a criminal history category of IV, this yielded a guideline range of 30 to 37 months of imprisonment. The court imposed a within-guidelines sentence of 30 months for the § 922(g)(1) offense and a mandatory consecutive sentence of 120 months for the § 844(h)(2) offense.

## II. Discussion

### A. Standard of Review

We review challenges to the procedural soundness of a sentence *de novo*, including challenges to a district court's interpretation of the Guidelines. *United States v. De La Cruz*, 897 F.3d 841, 844 (7th Cir. 2018). Incorrectly calculating the guideline range is procedural error. *See Rosales-Mireles v. United States*, 585 U.S. 129, 134 (2018). In parsing the Guidelines, we employ general rules of statutory construction, beginning with the plain language in the Guidelines and their application notes, which are generally considered authoritative. *Foster*, 902 F.3d at 657 (citing *Stinson v. United States*, 508 U.S. 36, 38 (1993)).

### B. Analysis

On appeal, Feeney renews his challenge to the district court's sentence for his conviction under § 922(g)(1). Specifically, he argues that the district court erred when it applied a base offense level of 18 under § 2K2.1(a)(5) instead of a base

offense level of 14 under § 2K2.1(a)(6). In doing so, he relies on the plain text of Note 4 to § 2K2.4. According to Feeney, Note 4 prohibits a court from double counting his possession of explosives in determining the base offense level for his § 922(g)(1) conviction because that conduct is already being punished through his conviction under 18 U.S.C. § 844(h).

The "cardinal principle" of textual interpretation is to "give effect, if possible, to every clause and word" of the text. *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). With this principle in mind, we begin with Note 4, which provides, in relevant part:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).

U.S.S.G. § 2K2.4 cmt. n.4.

The first sentence of Note 4 makes clear that a court may not apply a specific offense characteristic for the possession of an explosive or firearm to determine the sentence for an underlying conviction if that conduct is separately punished under § 2K2.4, as it is here. *See Foster*, 902 F.3d at 657–58. What is less clear from the text of Note 4, however, is whether a

court may apply *other* enhancements for the possession of explosives or weapons—for example, by increasing the base offense level—when determining the sentence for the underlying conviction. This question bears directly on Feeney's sentence. If the answer to this question is no, the district court erred when it applied a base offense level of 18 under § 2K2.1(a)(5), because that augmented base offense level relied on Feeney's possession of a firearm as described in 26 U.S.C. § 5845(a). We address this now as a matter of first impression.

To determine whether the district court erred in applying § 2K2.1(a)(5)'s base offense level to Feeney's § 922(g)(1) sentence, we proceed in two steps. First, we ask whether Note 4's prohibition is limited only to specific offense characteristics or whether it prohibits the application of any explosive or weapon enhancement to the underlying sentence. Second, if Note 4 prohibits any enhancement, we must determine whether augmenting a base offense level for conduct involving explosives or weapons is such an "enhancement" prohibited by Note 4.

We begin with the plain text of Note 4. The note's first sentence specifically instructs courts not to apply specific offense characteristics for firearms and explosives in calculating the underlying sentence. That much is clear. But the note does not stop there.

In the next sentence, the note uses language that sweeps more broadly. It continues: "A sentence under [§ 2K2.4] accounts for *any explosive or weapon enhancement for the underlying offense of conviction*, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G.

§ 2K2.4 cmt. n.4 (emphasis added). If, as Note 4 states, a sentence under § 2K2.4 accounts for "any" explosive or weapon enhancement for the underlying offense, that leads us to conclude that courts are prohibited from applying "any" explosive or weapon enhancement to the underlying sentence—not just those attributable to specific offense characteristics.

Our conclusion regarding Note 4's scope accords with traditional rules of statutory interpretation. According to the rule against surplusage, we aim to give independent meaning to the entire text so that no part is rendered meaningless. *See Loughrin*, 573 U.S. at 358. Here, if we read Note 4's prohibition as limited to specific offense characteristics as the government suggests, the word "any" would have no meaning. Indeed, such an interpretation would read the main clause of the second sentence out of the text entirely.

In response, the government offers a textual argument of its own—that Note 4's prohibition covers only specific offense characteristics because the "do not apply" command in the first sentence appears only in conjunction with specific offense characteristics and not "any … enhancement." We do not see this conclusion as inevitable based on the plain text of Note 4. Instead, we read the first sentence as prohibiting double counting of special offense characteristics. Then, the second sentence broadens the *scope* of that prohibition to include any explosive or weapons enhancements to determine the underlying sentence. Besides, as discussed, narrowly focusing on the first sentence reads out what the second sentence makes clear—that a sentence under § 2K2.4 "accounts for *any* explosive or weapon enhancement for the underlying offense of conviction." U.S.S.G. § 2K2.4 cmt. n.4 (emphasis added).

Although we base our conclusion primarily on Note 4's plain text, our reading also comports with Note 4's overarching purpose to prevent duplicative punishment.[1] For example, the Sentencing Commission's comments in Amendment 599 (which put in place the language of Note 4) provide that Note 4 was enacted to "avoid unwarranted disparity and duplicative punishment." U.S.S.G. Supp. to App. C, Amend. 599 (2000). The Commission further explained that the amendment was "intended to avoid the duplicative punishment that results when sentences are increased under both the statutes and the guidelines for substantially the same harm." *Id.*; *see also United States v. Mays*, 967 F.3d 748, 753 (8th Cir. 2020) ("The stated purpose of Application Note 4 is to avoid duplicative punishment, known as double counting in the Guidelines universe.").

Taking the government's approach in this case would punish Feeney twice for carrying the explosive—once in his augmented base offense level under § 2K2.1(a)(5) for the underlying § 922(g)(1) conviction, and again through his § 844(h)(2) conviction for carrying an explosive during the commission of a felony. We think such a reading is inconsistent with the stated purpose of Note 4.

Our view also gains support from Application Note 2 to U.S.S.G. § 1B1.2, which describes how a district court should determine the guidelines applicable to an offense under Chapter Two. It states in part that "[w]here there is more than one base level within a particular guideline, the

---

[1] Of course, "double counting is generally permissible" unless, as here, "the text of the guidelines expressly prohibits it." *United States v. Vizcarra*, 668 F.3d 516, 519 (7th Cir. 2012).

determination of the applicable base offense level *is treated in the same manner* as determination of a specific offense characteristic." U.S.S.G. § 1B1.2 cmt. n.2 (emphasis added). If we are to determine the base offense level "in the same manner" as specific offense characteristics in calculating the applicable guidelines, it also stands to reason that we should treat them similarly for the purposes of Note 4's prohibition against double counting.

Finally, we offer one practical point. If we place ourselves in the shoes of the Sentencing Commission, we see little reason to prohibit the double counting of conduct contained in specific offense characteristics but not in augmented base offense levels when both punish similar conduct. True, base offense levels and specific offense characteristics are contained in separate subsections of the Guidelines. But despite this difference in categorization, they function in the same way—both operate to increase a defendant's overall offense level if the underlying offense involved an explosive or weapon. *See United States v. Diekemper*, 604 F.3d 345, 354 (7th Cir. 2010) (noting that double counting occurs when "precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways"). Given this, we think it unlikely that the Sentencing Commission would have intended to allow double counting of one category of enhancement but not the other.[2]

---

[2] In fact, this is exactly what the district court did. Acknowledging that it could not increase the total offense level for Feeney's § 922(g)(1) conviction by applying a specific offense characteristic for the explosive, it instead increased the base offense level for the § 922(g)(1) conviction based on the same conduct. Indeed, it did so because it found Feeney's possession of the explosive to constitute relevant conduct under § 1B1.3, despite

The government's other arguments are equally unpersuasive. First, the government contends that because the examples that follow the relevant language in Note 4 all pertain to specific offense characteristics, we cannot read "any … enhancement" to encompass anything other than specific offense characteristics. But the point of an *example* is merely to illustrate a rule's application based on a specific set of facts—not to demonstrate the full range of circumstances to which a rule might apply. Because these examples were not meant to be all-encompassing, we think the plain language of Note 4's first two sentences provides more reliable insight into what the Sentencing Commission intended.

Second, the government also asks us to compare Note 4 of § 2K2.4 with Application Note 7 of § 2K2.1, which provides that a "defendant whose offense involves a destructive device receives both the base offense level from the subsection applicable to a firearm listed in 26 U.S.C. § 5845(a) … and the applicable enhancement under subsection (b)(3)." U.S.S.G. § 2K2.1 cmt. n.7. According to the government, because the Sentencing Commission in Note 7 explicitly mentioned both the base offense level and the special offense characteristics, the Commission's language in Note 4 referring to only specific offense characteristics must limit the entire paragraph to specific offense characteristics. We find this attenuated comparison unconvincing. The fact that another note from

---

Note 4's admonition that Feeney's mandatory consecutive ten-year sentence for violating § 844(h)(2) "accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 2K2.4 cmt. n.4.

another guideline provision refers to the two terms separately bears little on whether Note 4's use of "any … enhancement" includes enhancements besides special offense characteristics.

Having established that Note 4's prohibition extends to "any … enhancement" and not just those based on specific offense characteristics, the next question is whether an augmented base offense level that relies on conduct involving explosives or weapons counts as an "enhancement" under the text of Note 4. We conclude that it does.

Because the Guidelines do not define "enhancement," we look to its plain meaning. *See United States v. Taliaferro*, 211 F.3d 412, 415 (7th Cir. 2000). In simple terms, its root "enhance" means to "heighten" or to "increase." *Enhance*, Merriam-Webster, https://www.merriam-webster.com/dictionary/enhance (last visited Apr. 25, 2024). Black's Law Dictionary further defines "enhancement" as "[a]n upward adjustment to a defendant's offense level under applicable sentencing guidelines." *Enhancement*, Black's Law Dictionary (11th ed. 2019). Looking to these definitions, it is clear to us that when a district court applies a higher base offense level premised on use of an explosive or firearm, it is employing an "enhancement" because a higher base offense level acts as a net increase to the defendant's total offense level. In this case, for example, the district court's application of § 2K2.1(a)(5) instead of § 2K2.1(a)(6) added four points to Feeney's total offense level—up from 11 to 15.

Consistent with this construction, we have used the term "enhancement" to refer to both increases based on graduated base offense levels and specific offense characteristics. *See, e.g.*, *United States v. Ruth*, 966 F.3d 642, 652 (7th Cir. 2020); *United States v. McDonald*, 592 F.3d 808, 810 (7th Cir. 2010).

The government argues that the distinction between base offense levels and specific offense characteristics did not matter in any of these cases, and that, as a result, we were not using "enhancement" as a term of art. But if true, this only supports our conclusion that the plain meaning of "enhancement" is broad and not confined to increases based on specific offense characteristics. *See Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) ("[G]eneral words … are to be accorded their full and fair scope" and should not be "arbitrarily limited.").

Finally, we note that the district court's miscalculation of the guideline range in this case was not harmless. *See United States v. Bravo*, 26 F.4th 387, 396 (7th Cir. 2022). The court imposed a sentence within the range it calculated, and it did not suggest that Feeney would have received the same sentence if the guideline range were lower. *Id.* at 396–98.

### III. Conclusion

For these reasons, we VACATE Feeney's sentence and REMAND the case to the district court for resentencing consistent with this opinion.

KIRSCH, *Circuit Judge*, dissenting. This appeal asks us to resolve a single, narrow question: Does Application Note 4 of U.S.S.G. § 2K2.4 only limit enhancements based on "specific offense characteristics," or does it also affect the preliminary step of determining a defendant's base offense level? The majority interprets Application Note 4 to include the latter. I disagree.

The plain text of § 2K2.4, its accompanying commentary, and the structure of the Sentencing Guidelines as a whole all indicate that "enhancement" only applies to "specific offense characteristics" and does not refer to the initial base offense level determination. The command of Application Note 4 is clear: "[D]o not apply any specific offense characteristics…." The note says nothing about the base offense level, which is a threshold determination that acts as a starting point for the Guidelines calculation. Only after defining that starting point does the district court have anything to enhance based on specific offense characteristics. Therefore, I respectfully dissent.

I

We interpret the Sentencing Guidelines in the same way that we interpret statutes—beginning with the text of the relevant provision and discerning its plain meaning. *United States v. Foster*, 902 F.3d 654, 657 (7th Cir. 2018). In addition to that text, we consider the application notes, which are treated as part of the Guidelines themselves. *United States v. Von Loh*, 417 F.3d 710, 713 (7th Cir. 2005). When possible, we construe statutes so that no clause, sentence, or word is superfluous or insignificant. *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Further, when deciding between competing understandings of a statute, we consider the objectives of the larger statutory scheme and select the meaning that is compatible with the rest

of the law. *River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 651 (7th Cir. 2011).

A

Application Note 4 of § 2K2.4 provides:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for *any explosive or weapon enhancement* for the underlying offense of conviction, including *any such enhancement* that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).

U.S.S.G. § 2K2.4 n.4 (emphasis added). The dispute on appeal revolves around the italicized language in the second sentence. The majority concludes that the second sentence expands the first sentence to apply not only to specific offense characteristics but also to base offense levels, rendering the first sentence entirely superfluous of the second. *Ante*, at 11. This conclusion does not comport with the plain language of Application Note 4.

The first sentence of Application Note 4 acts as an unequivocal command to district courts: "[D]o not apply" specific offense characteristics for possession of an explosive to the underlying offense (here, felon in possession of a firearm). The second sentence then states the reason for that command: "A sentence under this guideline accounts for any explosive

or weapon enhancement for the underlying offense of conviction …." Nowhere does the note expand the scope of the command to apply to base offense level determinations, as the majority now posits.

This aligns with Application Note 4's amendment history. Before 2000, the note consisted only of the first sentence (directing courts not to apply specific offense characteristics). Through Amendment 599, the Sentencing Commission added the second sentence and included pertinent examples applying the Guideline. The Sentencing Commission's reason for adding this language could not have been clearer: to "clarif[y] application of the commentary." U.S.S.G. Supp. to App. C, Amend. 599 (2000). At no point did the Sentencing Commission suggest that the amendment was meant to expand the scope of the note beyond its original language to limit base offense level determinations. This is buttressed by the Commission's subsequent citations to several example cases where courts misinterpreted the original language of the note. Notably, in all of those cases, the courts had wrongly applied enhancements based on specific offense characteristics rather than on base offense level determinations. See, e.g., *United States v. Willett*, 90 F.3d 404, 407–08 (9th Cir. 1996) (applying a specific offense weapons enhancement because the defendant used different weapons in the underlying offense). Accordingly, the Sentencing Commission amended Application Note 4 to account for those errors and resolve disparate interpretations of the note's original text.

The Background further reinforces this limited scope of Application Note 4. See *United States v. Womack*, 610 F.3d 427, 432 (7th Cir. 2010) (relying on the Guidelines background section to ascertain "Congress's preference"). Namely, the

Background of § 2K2.4 provides: "To avoid double counting, when a sentence under this section is imposed in conjunction with a sentence for an underlying offense, *any specific offense characteristic* for explosive or firearm discharge, use, brandishing, or possession is not applied in respect to such underlying offense." (emphasis added). Again, the text makes clear that the purpose of the Guideline is to limit offense level increases based on specific offense characteristics rather than on initial base offense level determinations (which are not increases at all, as explained below). This alone resolves our question on appeal.

B

Notwithstanding the fact that the Sentencing Commission did not expand the scope of the note by adding the second sentence, I also disagree with the majority's broad interpretation of "enhancement." To analyze the term, I first describe the boundary in the Guidelines between the two central concepts at the heart of this case—base offense level determinations on the one hand and specific offense characteristics on the other. Second, I provide an overview of how the Guidelines have generally used enhancement as a term of art with those concepts. And third, with this context in mind, I parse the text of Application Note 4 itself.

The Guidelines meticulously explain how a district court is to calculate a Guidelines range when imposing a sentence: "The court shall determine the kinds of sentence and the guideline range as set forth in the guidelines … by applying the provisions of this manual in the following order …." U.S.S.G. § 1B1.1(a). Continuing, the Guidelines distinguish between a base offense level determination and an application of specific offense characteristics: namely, the court shall

"[d]etermine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed." *Id.* § 1B1.1(a)(2). In other words, once the district court identifies the relevant Chapter Two section applicable to a conviction, it naturally must determine the base offense level first. In many cases, there is only one possible base offense level. See, e.g., *id.* § 2B3.2 (single base offense level of 18 for extortion by force). But in other instances, like this case, multiple base offense level options are available that depend on the defendant's conduct. Only after determining the base offense level does the court then apply enhancements to that base offense level—based on specific offense characteristics—to calculate the total offense level. See, e.g., *United States v. Prado*, 41 F.4th 951, 954 (7th Cir. 2022) ("The proper calculation would begin with the 20 base offense level, add a four-level enhancement for the number of firearms and a four-level enhancement for the obliterated serial number firearm, thus totaling 28, and then adding the additional four-level enhancement for the use in connection with a felony offense followed by the three-level deduction for acceptance of responsibility, yielding a total offense level of 29.").

Unsurprisingly, the Guidelines only use "enhancement" when referring to increases beyond a static, already-determined base offense level. I acknowledge that our precedent on occasion has described choosing the higher of two base offense level options as an enhancement. See, e.g., *United States v. Cherry*, 855 F.3d 813, 815 (7th Cir. 2017) (referring to the higher base offense level applicable in § 2K2.1(a)(3) as an enhancement). But those cases did not involve interpretation of the term as used in the Guidelines, and perhaps in the future, our language should be more precise. Rather than being used

as a term of art, enhancement was, at most, used to denote the increase in value from one base offense level to the next, in line with its broad English definition. But the term is not used so broadly in the Guidelines. I have not found one example where the Guidelines use enhancement to refer to picking one base offense level over another. Rather, the Guidelines consistently distinguish base offense level determinations from enhancement applications based on specific offense characteristics, emphasizing that the two concepts cover different aspects of a sentence, even if they apply based on the same conduct. See, e.g., U.S.S.G. § 2A2.2 Background (distinguishing the base offense level of aggravated assault from the specific offense characteristic weapon enhancement even if both apply based on the same conduct).

In fact, this exact distinction is made in one of the Guidelines at issue. Section 2K2.1(a) offers eight different base offense level options for convictions related to the unlawful receipt, possession, or transport of firearms. One of those options, § 2K2.1(a)(5), instructs courts to apply a base offense level of 18 if the offense involved a firearm described in 26 U.S.C. § 5845(a), which includes destructive devices. Then, separately, as a specific offense characteristic under § 2K2.1(b)(3)(B), the court is instructed to increase the base offense level by two if the offense involved a destructive device other than a portable rocket, missile, or device used to launch a rocket or missile. Thus, if a defendant unlawfully possesses a destructive device, he automatically begins at a higher base offense level of 18 under § 2K2.1(a)(5) and receives an additional two-level enhancement under § 2K2.1(b)(3)(B) for the same conduct. Application Note 7 of § 2K2.1 plainly addresses this scenario: "A defendant whose offense involves a destructive device receives both the *base offense level* from the

subsection applicable to a firearm listed in 26 U.S.C. § 5845(a) … and the applicable *enhancement* under subsection (b)(3)." (emphasis added). The note emphasizes that this result is acceptable because "[s]uch devices pose a considerably greater risk to the public welfare than other National Firearms Act weapons." The majority dismisses Application Note 7 as irrelevant. *Ante*, at 10–11. But the note exemplifies how the Guidelines have consistently used enhancement as a term of art and have eschewed the broad meaning the majority adopts. *Ante,* at 11. And the note relates directly to the criminal conduct in this case. Further, it illustrates the point that, while base offense levels and specific offense characteristics "function in the same way" by ultimately yielding a higher total offense level, *ante,* at 9, they have wholly separate purposes in punishing a defendant's criminal conduct. All told, § 2K2.1, like the Guidelines as a whole, defines a clear boundary between base offense level determinations and enhancements based on specific offense characteristics.

This boundary mirrors the language of Application Note 4 at issue. As in every other case where the Guidelines refer to an enhancement, the use of the term in the note's second sentence must refer to enhancements based on specific offense characteristics. See *River Road*, 651 F.3d at 651 (interpreting a statutory term while considering the overall statutory scheme and context). The Sentencing Commission's own use of enhancement confirms this interpretation. Recall that the original language of Application Note 4, before Amendment 599, was nearly identical to the first sentence of the note as it stands today—the text did not reference enhancement, only specific offense characteristics. See *United States v. Foster*, 902 F.3d 654, 659–60 (7th Cir. 2018) (comparing the language of § 2K2.4 before and after the amendment). Nonetheless, the

Commission described the note's original language as having "previously stated that if a sentence was imposed under § 2K2.4 in conjunction with a sentence for 'an underlying offense,' *no weapon enhancement* should be applied." U.S.S.G. Supp. to App. C, Amend. 599 (emphasis added). In its own words, then, the Commission used enhancement and specific offense characteristics interchangeably when referring to the note's pre-amendment text.

Moreover, Application Note 4 is replete with other clues confirming that "enhancement" refers only to increases to an established base offense level based on specific offense characteristics. For instance, the note gives several examples of enhancements that would not apply under the Guideline; unsurprisingly, each example relates to enhancements based on specific offense characteristics. Not one example precludes, as an "enhancement," the selection of a higher base offense level. Though these examples are not "all-encompassing," *ante*, at 10, the wholesale omission of any examples of base offense level determinations cannot be disregarded.

Two final textual points. First, the majority relies on dictionaries to ascertain the plain meaning of "enhancement." *Ante*, at 11 (noting the term means to "increase" or "heighten"). I have no quarrel with that definition. But one cannot increase the value of something that does not yet exist. Without first determining a base offense level, there is nothing to increase or heighten. And choosing a higher base offense level out of two (or more) options does not imply that the lower option is the default from which an increase takes place.

Second, the majority places far too much weight on "any enhancement" in the second sentence (and on the word "any"

in particular) to support an expansive interpretation of the term that wholly ignores the first sentence. *Ante*, at 7 (emphasizing "any" as broadening the scope of the first sentence). In the majority's view, my interpretation would render this language meaningless and create statutory surplusage. *Id.* Stated differently, why would the Sentencing Commission have added the second sentence, and "any enhancement" in particular, if not to include base offense level determinations?

But the use of "any" in the second sentence is not surplusage because the first sentence itself used the term—prohibiting "*any* specific offense characteristics." U.S.S.G. § 2K2.4 n.4 (emphasis added). The Sentencing Commission's decision to use "any" again in subsequent sentences does not broaden the meaning of enhancement. See *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (noting "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning'") (quotation omitted). Simply, the first sentence refers to "any specific offense characteristic," while the second sentence refers to "any enhancement." Based on the plain language of the note and its statutory background, this is a distinction without a difference.

Rather, it is the majority's interpretation that now renders portions of Application Note 4 meaningless: the introductory sentence to be specific. If the majority is correct that "any enhancement" refers to both specific offense characteristics and higher base offense levels, then the note's initial, narrow reference to "specific offense characteristics" would be redundant and pointless. The Sentencing Commission might as well have struck "specific offense characteristics" from the text because the "any enhancement" language fully encompasses

the concept. We do not interpret statutes this way. See *Duncan*, 533 U.S. at 174.

C

The majority also contends that applying § 2K2.4 only to specific offense characteristics would lead to impermissible double-counting. But there is no rule against double counting in the Guidelines; instead, "double counting is presumed permissible …." *United States v. Cook*, 850 F.3d 328, 334 (7th Cir. 2017) (quotation omitted); see also *United States v. Vizcarra*, 668 F.3d 516, 518 (7th Cir. 2012) ("[T]he default rule is that the same conduct may determine the base offense level and also trigger the cumulative application of enhancements and adjustments unless a specific guideline instructs otherwise."). And in this case, as I noted above, Application Note 7 in § 2K2.1 distinguishes a defendant's base offense level due to his use of a destructive device under § 2K2.1(a)(5) from the two-level enhancement under § 2K2.1(b)(3)(B) based on the same conduct. Correspondingly, the limitation in Application Note 4 of § 2K2.4 only serves to limit the application of the two-level § 2K2.1(b)(3)(B) enhancement, not the initial base offense level determination.

That is precisely what happened in this case. Feeney was convicted of violating 18 U.S.C. § 922(g)(1), which bars felons from possessing a firearm, and 18 U.S.C. § 844(h)(2), which prohibits the carrying of an explosive during the commission of a felony. Under U.S.S.G. § 2K2.4, the district court calculated the § 844(h)(2) Guidelines range to be the mandatory term of imprisonment required by statute. The § 922(g)(1) Guidelines range was determined separately under U.S.S.G. § 2K2.1. There, the district court first addressed the threshold step of determining the base offense level. Because Feeney

used a destructive device, his base offense level was 18 under § 2K2.1(a)(5). The majority views this as an enhancement because Feeney was assigned a base offense level of 18 rather than a base offense level of 14 under § 2K2.1(a)(6) (the base offense level for possession by a prohibited person). But the district court merely determined which of the eight possible base offense levels applied to Feeney based on his criminal conduct. Only then could the court enhance that offense level based on specific offense characteristics. Because of Application Note 4's command, however, the court correctly refrained from enhancing Feeney's offense level by two under § 2K2.1(b)(3)(B) (a specific offense characteristic). That is all that the note required.

The majority interprets Application Note 4 in a manner inconsistent with the plain text of the applicable Guidelines and its amendment history. "It is not our place to rewrite the guidelines," *United States v. Joseph*, 50 F.3d 401, 403 (7th Cir. 1995), and I would not do so here. For the reasons outlined above, I respectfully dissent.